Bruce BOLANDER, individually and as trustee of the David C. Bolander 1994 Irrevocable Trust, Respondent (A04–2003, A04–2031), Appellant (A04–2117),

J. Patrick Plunkett, guardian ad litem for plaintiff intervenors Katherine Bolander, et al., Respondent,

v.

David BOLANDER, et al., Appellants (A04–2003), Respondents (A04–2031, A04–2117),

Carl Bolander & Sons Co., et al., Respondents (A04–2003, A04–2117), Appellants (A04–2031),

Susan Bolander, et al., defendant intervenors, Respondents.

Nos. A04–2003, A04–2031, A04–2117.

Court of Appeals of Minnesota.

Aug. 9, 2005.

532

David T. Schultz, Cortney G. Sylvester, Nicole J. Druckrey, Halleland Lewis Nilan & Johnson, P.A., Minneapolis, Minnesota, for Bruce Bolander, individually and as trustee of the David C. Bolander 1994 Irrevocable Trust.

James E. Blaney, Moore Costello & Hart, P.L.L.P., St. Paul, Minnesota, for plaintiff intervenors.

Patrick J. Rooney, John J. Wackman, Marcia K. Miller, Rider Bennett, LLP, Minneapolis, Minnesota, for David Bolander, et al.

Richard T. Ostlund, Randy Gullickson, Anthony Ostlund & Baer, P.A., Minneapolis, Minnesota, for Carl Bolander & Sons Co., et al.

Charles E. Bethel, II, Christopher Heinze, Bethel & Associates, P.A., St. Paul, Minnesota, for defendant intervenors.

Considered and decided by HUDSON, Presiding Judge; KLAPHAKE, Judge; and MINGE, Judge.

## OPINION

HUDSON, Judge.

This appeal arises out of a lawsuit by Bruce Bolander against his parents, David and Dorothy Bolander, and against the family-owned company, Carl Bolander & Sons Co. (CB&S).[1] Bruce was the president and chief operating officer of CB & S from May 1994 until late 2000, when his employment was terminated. Following the termination, Bruce sued David, Dorothy, and CB&S, alleging shareholder oppression (Count I); breach of fiduciary duty/breach of contract (Count II); promissory estoppel (Count III); and misrepresentation (Count IV).

CB&S denied Bruce's claims and counterclaimed, alleging conversion (Count I); breach of contract (Count II); breach of fiduciary duty/duty of loyalty (Count III); accounting and constructive trust (Count IV); civil liability for theft (Count V); and receiving stolen property (Count VI). David and Dorothy denied Bruce's claims and counterclaimed for equitable relief under Minn.Stat. § 302A.467 for Bruce's violation of various provisions of the Minnesota Business Corporation Act, including §§ 302A.251 and .361 (Count I); alleging breach of fiduciary duty (Count II); seeking relief under Minn.Stat. §§ 501B.16 and

---

1. Because most of the significant parties to this case share the name Bolander, for clarity and ease of reference we will frequently refer to the parties by their first names. No disrespect is intended to any party by this usage.

.21 (Count III); and reformation or modification of the irrevocable trust with a declaration of the parties' rights under the shareholder agreement and the irrevocable trust (Count IV).

The parties moved the district court for summary judgment. On September 27, 2002, the district court granted summary judgment for David, Dorothy, and CB&S with respect to Bruce's demand for specific performance of the recapitalization provision in the shareholder agreement and Bruce's claims of breach of the employment contract, misrepresentation, and promissory estoppel. Additionally, the district court granted Bruce's motion for summary judgment on CB&S's claims against him for theft and conversion.

Subsequently, on January 7, 2003, the district court amended its September 27, 2002 order to allow Bruce to pursue his shareholder-oppression claim under Minn. Stat. § 302A.751. Thereafter, the matter was tried to a jury from January 6 to 17, 2003, on Bruce's breach-of-employment-contract claims and CB&S's counterclaim for repayment of funds advanced to Bruce; and to the district court without a jury from July 28 to 31, 2003, on the remaining claims. On Bruce's employment claims, the jury returned a special verdict finding that the employment agreement had been extended by the parties and that Bruce's employment was terminated without "due cause," as that term was defined in the agreement. Following the trials, on March 17, 2004, the district court entered findings of fact, conclusions of law, and an order for judgment as follows: (1) granting judgment in favor of Bruce and against CB&S on Bruce's breach-of-employment-contract claim in the amount of $1,368,000, plus interest, costs, and disbursements, including attorney fees; (2) granting judgment in favor of CB & S and against Bruce for breach of contract in the amount of $388,160, plus interest, costs, and disbursements, including attorney fees; and (3) dismissing all other claims with prejudice.

Bruce moved for amended and additional findings of fact and conclusions of law, and, alternatively, for a new trial. CB&S moved for judgment notwithstanding the verdict, amended findings, and, alternatively, a new trial. David and Dorothy moved for amended findings or a new trial.

On August 27, 2004, the district court entered a posttrial order in which it denied all posttrial motions submitted by all parties, but granted $530,583.32 for attorney fees to Bruce and $40,000 for attorney fees to CB&S. On September 8, 2004, judgment was entered with respect to the district court's orders of January 7, 2003, March 17, 2004, and August 27, 2004. David and Dorothy, CB&S, and Bruce all appealed. The guardian ad litem (the guardian) for Bruce's minor children submitted an appellate brief in response to David and Dorothy's appeal. This court consolidated the appeals.

On appeal, CB&S argues that (1) the district court's jury instructions were erroneous; (2) the district court erred by ruling that extrinsic evidence could be presented to show extension of a contract that required modifications to be in writing; (3) there is insufficient evidence to support the jury's verdict that Bruce was terminated without cause under the employment agreement; (4) the district court erred by concluding that the alleged extension of the employment agreement was not barred by the statute of frauds; and (5) the district court erred by awarding attorney fees to Bruce. David and Dorothy argue that the district court erred by (1) dismissing their claims under Minn.Stat. § 302A.467 and for breach of fiduciary duty; and (2) not distributing the trust assets to Bruce and his three siblings in separate, equal

shares under article 4.02 of the trust agreement.

Bruce argues that the district court erred by (1) denying him relief under Minn.Stat. § 302A.751 for violation of his minority-shareholder rights, including violations of the employment agreement; (2) granting summary judgment dismissing his shareholder-oppression claim regarding recapitalization under provision 1.2 of the shareholder agreement; (3) refusing to reopen the record to consider new evidence; (4) excluding evidence of David and Dorothy's amended wills and compensation; and (5) awarding fees and costs to CB&S.

Because we conclude that the district court's jury instructions were not erroneous and because there was sufficient evidence to support the jury's verdict, we affirm the award in favor of Bruce on his claim for breach of the employment agreement. Accordingly, we also affirm the district court's related award of attorney fees to Bruce. We conclude that the contract provision requiring that modifications be in writing did not preclude renewal or formation of a new contract after the written contract was substantially performed and the specified term had expired, that the existence of a new contract could be established by parol evidence, and that a new employment contract, formed after expiration of the parties' written agreement, was not barred by the statute of frauds.

Because we conclude that article 4.02 of the trust agreement is unambiguous, we affirm the district court's distribution of the trust assets to Bruce. But we hold that the district court abused its discretion by not granting David and Dorothy equitable relief under Minn.Stat. § 302A.467 and reverse and remand to the district court to grant relief.

Because we find that provision 1.2 of the shareholder agreement, dealing with re-capitalization, is ambiguous, we conclude that the district court erred by granting summary judgment dismissing Bruce's shareholder-oppression claim. Further, we conclude that the district court did not abuse its discretion by refusing to reopen the record to consider new evidence. We do not address Bruce's argument that the district court abused its discretion by excluding evidence of David and Dorothy's amended wills and compensation because we affirm the jury's verdict. Finally, we affirm the district court's award of attorney fees to CB&S.

## FACTS

CB&S is a fourth-generation, St. Paul-based, family-owned construction company founded in 1924. It is a closely held corporation under the Minnesota Business Corporation Act. Minn.Stat. § 302A.011, subd. 6a (2004). At all times relevant to this action, David Bolander was the chairman of the board of directors (the board) and CEO of CB&S. David Bolander's wife, Dorothy Bolander, also serves on the CB&S board of directors, and as the board chair and CEO of CB&S's wholly owned subsidiary, SKB Environmental, Inc. (SKB), which operates commercial landfills.

Bruce became the president and chief operating officer (COO) of CB&S in May 1994. Prior to becoming the president, Bruce was a partner with a large East Coast law firm, earning between $400,000 and $500,000 per year. In 1993, Bruce and his parents began serious discussions about his joining CB&S, with the goal that Bruce would eventually assume control of the company. In furtherance of this goal, Bruce met with Phillip Martin (Martin), a partner at Dorsey & Whitney with a specialty in business-succession planning. Bruce advised Martin of the general goals that he and his parents wanted to achieve

and for which they were seeking to retain counsel. Those goals were to:

(1) minimize estate taxes upon David and Dorothy's deaths;

(2) gradually transfer control of the business from David and Dorothy to Bruce; and

(3) deal fairly with Bruce's three siblings in the division of David and Dorothy's estate.

Martin began representing CB&S and David and Dorothy on or about July 23, 1993. After meeting with them, Martin sent a series of letters to David and Dorothy on July 23, 1993; August 25, 1993; and September 20, 1993. In each of these letters, Martin provided David and Dorothy with a synopsis of the plans for the business-succession and estate-planning issues that they had discussed.

In the September 20, 1993 letter, Martin advised David and Dorothy that the business-succession plan would have "two basic steps." The first step would involve a gift of CB&S stock aggregating $1.2 million in value to a newly created trust primarily for the benefit of Bruce. Martin advised David and Dorothy that the trust would provide that if "Bruce ceases to be a full-time employee with the Company within a certain number of years (as determined by the two of you and Bruce), the trust would thereupon be divided into separate trusts for the benefit of each of your children per stirpes." In the second step, the remaining CB&S common stock owned by David and Dorothy would be exchanged for a new class of preferred stock. In the letter, Martin also set forth his understanding that David and Dorothy would recapitalize the preferred stock sometime in the future, "when the Company can more readily afford it, but not later than March 31, 2000, provided that Bruce is still in the employ of the Company."

After sending the September 20 letter, Martin drafted the documents that comprised the estate and succession plan: an employment agreement; a shareholder agreement, and the Irrevocable Trust Agreement of David C. Bolander (trust agreement). The parties executed these documents on or about May 4, 1994.

Pursuant to the employment agreement, Bruce became president of CB&S for a specified term, ending March 31, 2000. Bruce's salary was $198,000, with an annual bonus of 15% of CB&S's consolidated pre-tax earnings, including those of its subsidiary, SKB. CB&S could terminate Bruce with or without due cause. "Due cause" was defined as embezzlement or misappropriation of company property, fraud, willful disobedience of lawful board directives, or material breach of the employment agreement. If terminated without due cause, Bruce was entitled to receive salary, bonuses, and benefits for the remainder of the specified term of employment.

The shareholder agreement prescribed the process to transfer control of CB&S to Bruce through a recapitalization of David and Dorothy's stock. David and Dorothy's shares would become preferred shares and the trust would become the majority owner of the voting stock. As trustee, Bruce would have voting control of CB&S after the recapitalization. And finally, pursuant to the terms of the trust agreement, David transferred 134,983 shares of CB&S common stock to the trust. Bruce's three siblings became contingent beneficiaries of the trust; Bruce's three children are residual beneficiaries of the trust.

As a result of the estate and succession plan, as of May 3, 1994, when Bruce became president of CB&S, CB&S had 392,190 outstanding shares of common stock, owned as follows:

| Shareholder | No. of Shares Owned | Percent |
|---|---|---|
| David Bolander | 119,867 | 30.56 |
| Dorothy Bolander | 100,850 | 25.71 |
| David C. Bolander 1994 Irrevocable Trust | 134,983 | 34.42 |
| Bolander Companies ESOP | 32,890 | 8.39 |
| Bruce Bolander | 3,000 | 0.76 |
| Susan Bolander | 600 | 0.15 |

CB&S suffered significant operating losses during most of Bruce's tenure, including a net loss of $1,732,338 for the fiscal year ending March 31, 2000. Although the employment agreement expired by its terms on March 31, 2000, Bruce continued to work for CB&S as its president and COO past that date with no change in his duties, compensation, or other conditions of employment. According to Bruce, the parties orally (and later by conduct) agreed to renew the employment agreement for a term expiring on March 31, 2002. CB&S denied that there was an oral agreement to extend the contract and otherwise disputed this characterization of Bruce's employment status.

Because of the net loss for the fiscal year ending March 31, 2000, Bruce did not receive a bonus for that year. Between September 1999 and March 2000, Bruce took approximately $194,000 in cash withdrawals from CB&S above his normal salary. When asked at trial if he believed it was in the best interests of the company and its shareholders and employees for him to withdraw such sums in addition to his base compensation during 2000, Bruce replied, "I have to answer as it probably wasn't in the company's best interest, but I needed to do what I needed to do to keep myself solvent."

David testified that in May 2000, he learned of Bruce's withdrawals. David testified that he told Bruce not to take further withdrawals; Bruce denies that he was given any such instruction. Around that same time, Bruce signed a promissory note to CB&S to repay the amounts withdrawn. Under the note, one-half was due and payable on March 31, 2001, and the other half was due on March 31, 2002. Bruce continued to take withdrawals from CB&S between May 2000 and October 18, 2000. On October 18, 2000, David and Dorothy learned that Bruce had taken additional funds from CB&S, bringing the total amount withdrawn to $353,000 in just over 18 months. David informed Bruce that he had decided to terminate Bruce's employment. Two days later, on October 20, 2000, CB&S completed the sale of SKB assets for more than $6,000,000. Bruce would have been entitled to a $780,000 bonus based on the SKB sale had he still been employed when the bonuses were calculated.

Shortly thereafter, on October 25, 2000, the board placed Bruce on paid leave and instructed Bruce to repay the $353,000. Bruce did not immediately repay the $353,000, and on November 29, 2000, the board terminated Bruce's employment, granting severance compensation through the end of 2000. Because his employment was terminated, Bruce did not receive, among other things, his expected bonus in connection with the $6,000,000 sale of SKB assets. Bruce sued CB&S and his parents, claiming, in part, that he was terminated without due cause and therefore was entitled to his salary, bonus, and benefits through March 31, 2002, the remainder of the extended employment term.

## ISSUES

I. Were the district court's jury instructions erroneous?

II. Did the district court err by ruling that extrinsic evidence could show extension of a contract requiring written modification?

III. Is there sufficient evidence to support the jury's verdict that Bruce was terminated without due cause under the employment agreement?

IV. Did the district court err by concluding that the extension of the employment agreement was not barred by the statute of frauds?

V. Did the district court err by awarding attorney fees to Bruce?

VI. Did the district court err by dismissing David and Dorothy's claims under Minn.Stat. § 302A.467 and their claim for breach of fiduciary duty?

VII. Did the district court err by not distributing the trust assets to Bruce and his three siblings in separate, equal shares under article 4.02 of the trust agreement?

VIII. Did the district court err by denying Bruce relief under Minn.Stat. § 302A.751 for violation of his minority-shareholder rights, including violations of the employment agreement?

IX. Did the district court err by refusing to reopen the record to consider new evidence?

X. Did the district court err by granting summary judgment dismissing Bruce's shareholder-oppression claim regarding the recapitalization provision set forth in provision 1.2 of the shareholder agreement?

XI. Did the district court properly exclude evidence of David and Dorothy's amended wills and compensation?

XII. Did the district court err by awarding fees and costs to CB&S?

## ANALYSIS

### I

The jury found that the parties had extended the employment agreement for a term of two years and that CB&S breached the agreement by terminating Bruce without due cause. The jury awarded Bruce damages of $1,368,000. On appeal, CB&S argues that the district court committed reversible error by (a) allowing Bruce to change his theory after the evidence was presented, from an alleged oral extension of the employment agreement to an alleged extension by conduct; (b) instructing the jury on a "preponderance of the evidence" standard rather than a "clear and convincing evidence" standard with respect to Bruce's claim for breach of the employment contract; (c) refusing to instruct the jury that a corporate officer has a fiduciary duty to act in the best interests of the company; and (d) instructing the jury that "poor performance" did not constitute "due cause" under the employment agreement.

■ The district court has broad discretion in determining jury instructions, and this court will not reverse in the absence of abuse of discretion. *Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 (Minn. 2002). District courts are allowed broad latitude in selecting the language for the jury charge as well as in determining the propriety of a specific instruction. *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn.1986). If an instruction destroys the substantial correctness of the charge as a whole, causes a miscarriage of justice, or results in substantial prejudice, the error requires a new trial. *Morlock v. St. Paul Guardian Ins. Co.*, 650 N.W.2d 154, 159 (Minn. 2002). A new trial is required if a jury instruction was erroneous and the error was prejudicial to appellant or if its effect cannot be determined. *Id.*

### A. Did the district court err by allowing Bruce to change legal theories?

■ CB&S terminated Bruce's employment in late 2000. By its terms, Bruce's

employment agreement expired on March 31, 2000. Bruce argued to the jury that the parties extended the employment contract to March 31, 2002. Bruce argued that his employment was not terminated for due cause, as that term was defined in the employment agreement, and he was, therefore, entitled to compensation through the expiration of the term of the renewed contract.

Throughout discovery on the breach-of-employment-contract claim, the record indicates that Bruce primarily argued that the written employment agreement had been extended by an alleged oral agreement between the parties. CB & S alleges that Bruce changed his claim from an alleged *oral* extension or renewal of the employment agreement to an alleged modification by *conduct* and that the change occurred only after all evidence had been presented. CB&S argues that the change occurred because the district court determined, during the conference on jury instructions, that different proof standards would be applied to an oral-modification claim (clear and convincing evidence) than to a claim based on an extension by conduct (preponderance of the evidence). CB&S alleges that the district court committed reversible error by allowing Bruce to change his legal theory after the close of the evidence in order to avoid the higher standard of proof and that, in any event, both theories had to be established by clear and convincing evidence.

CB&S cites *Standard Title Ins. Co. v. Roberts,* 349 F.2d 613 (8th Cir.1965), for the proposition that a plaintiff cannot amend a complaint to assert a new cause of action based on a wholly different theory of recovery after the case has been fully tried. But the district court may consider all issues raised in the pleadings and additional issues litigated by express or implied consent. *Septran, Inc. v. Indep. Sch.*

*Dist. No. 271,* 555 N.W.2d 915, 919 (Minn. App.1996). Notwithstanding Bruce's reliance on the existence of an alleged oral agreement to extend the contract, Bruce's complaint more generally alleged the existence of an agreement to extend his employment contract and asserted that he "understood that his employment was to continue on the same terms and conditions under all the existing plans and agreements in place." This language arguably encompasses both an express oral agreement to extend the contract and an extension established by the conduct of the parties. And the theory of an extension by conduct is fully consistent with Bruce's contention at trial that the employment agreement was in effect when he was terminated, with no apparent change in his day-to-day responsibilities after March 31, 2000. CB&S did not object to the presentation of this evidence during trial, and we conclude that the parties litigated the issue of an extension by conduct by consent.

Furthermore, CB&S has overstated the holding of *Standard Title,* which involved a different situation from the one presented here. In *Standard Title,* the Eighth Circuit held that the district court did not abuse its discretion in denying a posttrial motion to amend a complaint, when the prior complaint stated a contract claim based on a written guarantee and the proposed amendment would raise a claim for indemnification based on tort and unjust enrichment. 349 F.2d at 621. The court of appeals explained that "[t]he proffered amendment set forth a completely new cause of action, based on a wholly different theory from that alleged in the … complaint [that was tried]." *Id.* at 620. Here, Bruce did not move to amend, both theories for extension supported the same alleged breach of contract, and the claimed extension by conduct did not involve the assertion of a new cause of action or a

wholly different theory of recovery. On this record, we conclude that Bruce did not change his legal theory after the close of the evidence and that the trial court properly instructed the jury that it could consider both oral statements and the parties' conduct in determining whether the employment agreement had been extended or renewed.

## B. Did the district court err by instructing the jury on a "preponderance of the evidence" standard?

■ Over CB&S's objection, the district court instructed the jury that it was to apply a preponderance-of-the-evidence standard to the questions posed in the special verdict. Specifically, the district court instructed the jury that to answer any question "yes," "the greater weight of the evidence must support such an answer." The district court explained that the greater weight of the evidence means "that all of the evidence by whomever produced must lead you to believe it is more likely that the claim is true than not true. If the evidence does not lead you to believe it is more likely that the claim is true than not true, then the claim has not been proved by the greater weight of the evidence." As discussed *supra* Part I.A., the district court also instructed the jury to consider both conduct and oral statements in determining whether the parties extended the expiration date of the employment agreement. The jury answered "yes," to the first special-verdict question: "Did [CB&S] extend Bruce Bolander's employment agreement for a two year period to March 31, 2002?"

■ CB&S argues that extension of the contract for a two-year term was a "modification" of the written terms of the contract, and it was, therefore, subject to a heightened standard of proof, requiring

Bruce to establish the extension by clear and convincing evidence. We disagree and hold that extension of a services contract for an additional term, after substantial performance and expiration of the term stated in the written contract, is subject to the preponderance-of-the-evidence standard that ordinarily applies to proving the elements of a contract claim.

■ As a general rule, the standard of proof when interpreting contracts and determining the elements of a contract claim is preponderance of the evidence. *See, e.g., ICC Leasing Corp. v. Midwestern Mach. Co.*, 257 N.W.2d 551, 555 (Minn. 1977); *Marshall v. Marvin H. Anderson Constr. Co.*, 283 Minn. 320, 326, 167 N.W.2d 724, 728 (1969). Some contract claims are subject to a heightened standard of proof. For instance, when a party seeks to rescind a written contract on the basis of fraud, the alleged fraud must be established by clear and convincing evidence. *See Taylor v. Sheehan*, 435 N.W.2d 575, 577 (Minn.App.1989) (noting inconsistencies in caselaw on the standard of proof and relying on *Weise v. Red Owl Stores, Inc.*, 286 Minn. 199, 203, 175 N.W.2d 184, 187 (1970)), *review denied* (Minn. Apr. 24, 1989). And when a party asserts that there has been an enforceable oral modification of the terms of a written contract, that party "has the burden of proving the modification [of the written contract] by clear and convincing evidence. The burden is not met by a mere preponderance of the evidence." *Merickel v. Erickson Stores Corp.*, 255 Minn. 12, 15, 95 N.W.2d 303, 305 (1959) (involving a claim that the parties had modified a written construction contract to change the dimensions of a building while under construction).

■ This court respects written contracts and subjects allegations of an inconsistent oral contract to a rigorous examina-

tion. "[T]o be justified in setting aside a written contract and holding it as abandoned or substituted by a subsequent parol contract at variance with its written terms the evidence must be clear and convincing." *Kavanagh v. The Golden Rule,* 226 Minn. 510, 517, 33 N.W.2d 697, 700 (1948) (quoting *Dwyer v. Ill. Oil Co.,* 190 Minn. 616, 619, 252 N.W. 837, 838 (1934)). But Bruce's breach-of-contract claim does not rely on proof of fraud or an oral modification that is *inconsistent* with the terms of the written contract. He did not deny that the written contract governed the employment relationship through March 31, 2000, and he did not seek to abandon it or substitute an oral contract at variance with the terms of the written employment agreement. Instead, he claimed that the parties agreed to an extended employment contract governing their relationship *after* the written contract expired. And the terms he seeks to enforce for the term of employment after the written contract expired are substantially *the same* as those in the parties' written agreement.

CB&S mistakenly relies on cases involving modification of the terms of a written contract, including *Reliable Metal, Inc. v. Shakopee Valley Printing, Inc.,* 407 N.W.2d 684 (Minn.App.1987). But these cases are inapposite and all involve modification or waiver of significant provisions of written contracts. *Reliable* involved a construction contract that specified that the builder would "consider a trade credit" to partially offset the price of the contract. *Id.* at 685. The builder ultimately rejected the trade credit, insisted on payment under the terms of the contract, and sued for breach. *Id.* at 686. This court held that the language of the written contract did not bind the builder to *accept* a trade credit and that no oral modification of that provision had been established by clear and convincing evidence. *Id.* at 687. Because no modification of the price term

was established by the requisite heightened standard, the terms of the written contract were enforceable. *Id.*

When a contract governs the duties of the parties for a specified term and it has expired, the parties may thereafter enter into a new contract by conduct (continued payment and performance) or otherwise, and they may adopt the provisions of their former contract or agree to modify them. *Steele v. Great E. Cas. & Indem. Co.,* 158 Minn. 160, 162, 197 N.W. 101, 101 (1924). The existence of an extension or renewal is not subject to a heightened standard of proof. Once parties to a written contract for services have left that contract "behind," with one party continuing to perform services for the other, "which the latter accepts, . . . a promise to pay may or even must be implied." *Benedict v. Pfunder,* 183 Minn. 396, 400, 237 N.W. 2, 4 (1931); *see also House v. Baxter,* 371 N.W.2d 26, 29 (Minn.App.1985) (involving a party who continued employment "for several years" after a specified term in written contract and holding that the agreement may have been impliedly extended by the "parties' conduct and intent after expiration of the written agreement," with the new agreement incorporating significant terms from the expired written agreement). There is no applicable authority requiring that the existence of a new "promise to pay" for services rendered after expiration of the term of a written contract must be established by the heightened standard applicable to claims for fraud, rescission, or oral modification of the terms of written contracts.

We conclude that the existence of a renewed or extended contract for services, after the expiration of the term specified in the parties' written contract, must be established by the preponderance of the evidence. Thus, the district court did not err

in instructing the jury on the standard of proof.

**C. Did the district court abuse its discretion by failing to instruct the jury that a corporate officer has a fiduciary duty to act in the best interests of the company and that failure to do so constitutes a material breach?**

CB&S argues that the district court erred by refusing to instruct the jury that a corporate officer has a fiduciary duty to act in the best interests of the company.

The employment agreement provides that "due cause" for termination occurs if:

(i) the Executive shall embezzle funds or misappropriate other property of the Corporation or any Affiliated Entity or engage in fraudulent conduct as regards the Corporation or any Affiliated Entity, or (ii) the Executive shall willfully disobey a lawful directive of the Board, whether through commission or omission, or (iii) the Executive shall breach this Agreement in a material manner.

The district court gave the following jury instruction on due cause:

The employment agreement that expired by its terms on March 31st, 2000, defines due cause for termination.

Due cause for terminating Bruce Bolander exists if he embezzled funds or misappropriated corporate property, engaged in fraudulent conduct regarding the corporation, willfully disobeyed a lawful directive [of] the company's Board, by an act or by a failure to act, or materially breached the employment agreement.

Poor performance does not constitute due cause as defined in the employment agreement. The term, "material breach" generally means the failure to perform an obligation required by the contract which is central to the achievement of the purpose of the contract.

The district court declined to use CB&S's proposed jury instruction:

As an Officer [President] and Director of Carl Bolander & Sons Co., Bruce Bolander was obligated to perform his duties in the following manner:

An officer and/or director shall discharge the duties of the position in good faith, in a manner the officer/director reasonably believes to be in the best interests of the corporation, and with the care an [ordinarily] prudent person in a like position would exercise under similar circumstances.

If Bruce Bolander failed to discharge his duties as an Officer and Director of Carl Bolander & Sons Co. in the manner required of him, he breached the terms of his alleged employment agreement.

CB&S argues that the district court's refusal to give this jury instruction was prejudicial error because the jury "was denied receipt of appropriate legal guidance" concerning Bruce's responsibilities as president and COO of CB&S under the Minnesota Business Corporation Act. CB&S cites *Backus v. Finkelstein*, 23 F.2d 357, 361 (D.Minn.1927), *Prozinski v. Ne. Real Estate Serv., LLC*, 59 Mass.App.Ct. 599, 797 N.E.2d 415, 424 (2003), and *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 385 (Mo.Ct.App.2000), for the proposition that violations of an officer's fiduciary duty per se constitute a breach of an employment agreement.

Bruce argues that the terms of the employment agreement do not support CB&S's assertion that "breach of common-law or statutory duties would have breached the Agreement." Bruce also argues that giving the proposed jury instruction would have confused the jury because the claims for alleged breach of fiduciary and

statutory duties were addressed in the portion of the bifurcated proceedings that was tried to the court, rather than being submitted to the jury.

Here, the district court acted within its discretion by refusing to give CB&S's proposed jury instruction. The parties contracted that only a *material* breach of the employment agreement, rather than a lesser breach, constituted due cause for termination. Thus, CB&S's proposed jury instruction did not comport with the parties' due cause provision. We therefore do not reach CB&S's argument that violations of an officer's fiduciary duty per se constitute a breach of an employment agreement. But we note that under *Backus,* a court in equity may require an officer who has breached his fiduciary duty to the corporation to forfeit compensation he is otherwise due. *See Backus,* 23 F.2d at 361; *see also infra* Part VI. Accordingly, the district court did not abuse its discretion by failing to instruct the jury in accordance with CB&S's proposed jury instruction.

**D. Did the district court abuse its discretion by instructing the jury that "poor performance" did not constitute "due cause" under the employment agreement?**

■ CB&S argues that the district court abused its discretion by instructing the jury that "poor performance" does not constitute "due cause" under the employment agreement. CB&S argues that the instruction was prejudicial to CB&S because "it took away from CB&S the proper argument that [Bruce] was terminated for due cause because he materially breached his employment agreement through his performance, which was one of the specific contractual definitions of due cause." CB&S also argues that the district court's jury instruction was "hopelessly confusing" for the jury because the instruction stated that poor performance does not constitute due cause, but then defined "material breach" as "failure to perform."

Bruce correctly argues that the district court's instruction that the financial condition of the company, without more, did not establish the existence of due cause was within the district court's broad discretion. The instruction was clearly consistent with the express language of the due-cause definition in the employment agreement. *See Morlock v. St. Paul Guardian Ins. Co.,* 650 N.W.2d 154, 159 (Minn.2002) (indicating that the district court has discretion to instruct the jury on the construction of clear and unambiguous contract terms). The district court's instruction that poor performance did not satisfy the contractual definition of due cause, absent proof of a material breach, was consistent with the contract terms and not an abuse of discretion.

Furthermore, the jury instruction was not confusing. CB&S mischaracterizes the district court's definition of "material breach" as "failure to perform," asserting that the instruction was circular and therefore confusing. The district court's *entire* definition of "material breach" was "failure to perform an obligation required by the contract which is central to the achievement of the purposes of the contract." It is possible that "failure to perform" (constituting a material breach) could be confused with "poor performance" (which does not constitute a material breach). But the district court's full definition of "material breach" required more than mere failure to perform, and it correctly reflected the contract. Thus, the district court's instruction was not an abuse of discretion.

**II**

CB&S challenges the district court's denial of its summary judgment and JNOV motions on Bruce's claim for a breach of

the employment agreement, arguing that the claim was barred because the employment agreement was not extended in writing.

On appeal from summary judgment, this court asks whether there are any genuine issues of material fact and whether the district court erred in applying the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). "Summary judgment is not a trial of issues of fact. It is a proceeding designed to determine if issues of fact exist." *Corwine v. Crow Wing County*, 309 Minn. 345, 361, 244 N.W.2d 482, 491 (1976).

 Unless otherwise agreed between the parties, the employment relationship is at-will. *Aberman v. Malden Mills Indus., Inc.*, 414 N.W.2d 769, 771 (Minn.App.1987). Under Minnesota law, an at-will employee can be discharged for any reason or no reason at all. *Vonch v. Carlson Cos., Inc.*, 439 N.W.2d 406, 408 (Minn.App.1989), *review denied* (Minn. July 12, 1989). And an at-will employee has no claim for wrongful termination or breach of an employment contract once discharged. *See Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173, 183–84 (Minn.App.2001).

 The employment agreement stated: "This Agreement may not be amended, supplemented, canceled, or discharged except by a writing duly executed by the Corporation and the Executive." It is undisputed that the parties did not amend the agreement in writing. It is also undisputed that Bruce continued to work for CB&S after March 31, 2000.

CB&S argues that Bruce became an at-will employee when his employment agreement expired and, therefore, had no valid claim for breach of an employment contract. But, because Bruce continued to work for CB&S after March 31, 2000, a genuine issue of material fact existed as to whether he was an at-will employee or whether the parties, by express agreement or conduct, extended the employment agreement. Accordingly, the district court did not err by denying CB&S's motions for summary judgment and JNOV on Bruce's claim for breach of the employment agreement.

## III

CB&S argues that even if the employment agreement had been extended, the district court erred by not granting JNOV because Bruce was terminated for due cause as a matter of law.

 In reviewing a trial court's granting or denying a motion for judgment notwithstanding the verdict, this court determines whether there is any competent evidence reasonably tending to sustain the verdict. *Blue Water Corp., Inc., v. O'Toole*, 336 N.W.2d 279, 281 (Minn.1983). The jury's verdict stands unless it is manifestly and palpably contrary to the evidence, considered in the light most favorable to the plaintiff. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 256 (Minn. 1980). Verdicts are upset only in extreme circumstances. *Ralph Hegman Co. v. Transamerica Ins. Co.*, 293 Minn. 323, 327, 198 N.W.2d 555, 558 (1972).

 CB&S argues that Bruce was terminated for due cause as a matter of law because he willfully disobeyed a lawful directive of the board and materially breached the employment agreement. CB & S argues that Bruce materially breached the employment agreement by (1) admittedly violating legal duties as president/COO by failing to act in the best interests of CB&S and by continuing to take advances from CB&S at a time of critical financial need; and by (2) disobeying the board's directives not to take more advances after

May 2000 and to attend a board meeting to discuss his actions and plan to pay back the advances. CB&S further argues that the district court's independent findings following the bench trial establish that Bruce materially breached his employment agreement.

Bruce argues that whether the loans were contrary to the best interests of the company was a disputed factual issue. Bruce also argues that the "legal duties" to which CB&S refers are not found in the terms of the employment agreement. Finally, Bruce argues that he could not have violated a lawful board directive because he never received one.

CB&S has not demonstrated that Bruce was terminated for due cause as a matter of law. The jury considered and rejected CB&S's arguments. Where David and Bruce's testimonies conflicted, we assume that the jury believed Bruce and disbelieved David. *See Dick Weatherston's Assoc. Mech. Servs., Inc. v. Minn. Mut. Life Ins. Co.*, 257 Minn. 184, 189, 100 N.W.2d 819, 823 (1960) (indicating that credibility determinations are primarily for the jury and the trial court).

Here, it appears that the jury believed Bruce's testimony that: (1) he borrowed money from CB&S to meet his personal expenses on one occasion prior to 1999; (2) he repaid the loan by having CB&S deduct the amount owed from his next bonus; (3) he borrowed the money from CB&S because David told him that borrowing "was not a problem," and CB&S had loaned a substantial amount of money to the chief financial officer to help him buy a house; (4) he continued to borrow money from CB&S after 1999; (5) on March 31, 2000, David told Bruce that CB&S would not pay either of them bonuses for that year, but that CB&S could lend Bruce some money to meet his expenses during the year; (6) he told David that he had already

taken loans from CB&S; (7) in May of 2000 Bruce signed a promissory note for $194,173.30 to cover the amounts he had borrowed through March 31, 2000; (8) David learned of the amount that Bruce had borrowed and asked Bruce how he was going to repay the advances; (9) Bruce indicated that he planned to pay CB&S the money out of his future bonuses; and (10) during this conversation, David never told Bruce not to take any more advances. Further, Bruce testified that he did not receive a written directive from the board prohibiting him from borrowing any more money from CB&S. Thus, on this record, the jury could have concluded that Bruce never received a board directive prohibiting him from taking advances from CB&S.

Additionally, Bruce testified that David terminated his employment on October 18, 2000. David told Bruce that he assumed the employment agreement was still in effect and that he was terminating Bruce "for cause" under the agreement because Bruce had borrowed money from CB&S after he allegedly told Bruce not to borrow any more money. Bruce did not receive written notice from the board prior to October 18, 2000. The employment agreement delineated that CB&S would tell Bruce if it intended to terminate his employment based on a specific reason and give him the opportunity to cure. Bruce testified that the board sent him notices of board meetings after he was fired, to which he did not respond "[b]ecause it would have been a useless act." Bruce further explained, "I could go to this meeting and be told—be told to pay—pay the money back after they had already fired me and taken away my ability to do it." Finally, Bruce testified that, prior to October 18, 2000, no one indicated to him that he had in any way breached a material provision of the employment agreement.

On this record, the jury could have concluded that Bruce did not willfully violate a board directive.

The jury could also have concluded that Bruce did not materially breach the employment agreement. The employment agreement does not make adherence to fiduciary obligations a condition of employment. Thus, CB&S cannot identify specific provisions of the employment agreement that Bruce's alleged material breach violates. Further, while the district court may have determined at the bench trial that Bruce breached his fiduciary obligation to act in CB&S's best interests, such a finding does not constitute a material breach of the employment agreement as a matter of law.

Because the jury's verdict is not manifestly and palpably contrary to the evidence when considered in the light most favorable to Bruce, the district court did not err by denying CB&S's motion for JNOV.

**IV**

CB&S argues that the district court erred by not dismissing Bruce's claim that the parties agreed to extend his employment agreement by two years, alleging that Bruce's claim is barred by the statute of frauds.

■ The statute of frauds states that no action shall be maintained upon any agreement that by its terms is not to be performed within one year unless the agreement is in writing. Minn.Stat. § 513.01 (2004). "The test is simply whether the contract by its terms is capable of full performance within a year, not whether such occurrence is likely." *Eklund v. Vincent Brass & Aluminum Co.*, 351 N.W.2d 371, 375 (Minn.App.1984) (quotation omitted), *review denied* (Minn. Nov. 1, 1984).

■ CB&S argues that Bruce's claim that the parties extended the term of the employment agreement an additional two years, to March 31, 2002, is barred by the statute of frauds because it is incapable of being performed within one year. CB&S cites *Roaderick v. Lull Eng'g Co.*, 296 Minn. 385, 208 N.W.2d 761 (1973), in support of its argument. In reply, Bruce cites *Eklund* for the proposition that the statute of frauds does not apply to a contract providing a maximum term of employment greater than one year. In *Eklund*, the oral contract was for permanent employment until retirement, so long as Eklund performed satisfactorily. *Id.* at 375. This court concluded that the contract could be performed within one year in the following circumstances: (1) Eklund's death; (2) Eklund voluntarily departed; or (3) Eklund failed to perform satisfactorily. *Id.* at 375–76.

*Roaderick,* cited by CB&S, is distinguishable because it addresses a minimum term of more than one year—which, by definition, cannot be performed in less than one year. *See Roaderick,* 296 Minn. at 388, 208 N.W.2d at 763 (indicating that the employee's alleged oral contract called for a minimum of two years' employment). In our view, the present facts are more analogous to those in *Eklund* because the contract at issue here was allegedly extended for a two-year maximum, and Bruce could have died, voluntarily departed, or been fired during that time. *See also House v. Baxter,* 371 N.W.2d 26, 29–30 (Minn.App.1986) (holding that the statute of frauds is not a bar to an extension of a written contract by conduct). Therefore, the district court correctly determined that the statute of frauds did not bar Bruce's claim.

**V**

CB&S argues that the district court erred by awarding $530,583.32 in attorney fees to Bruce.

Attorney fees are not recoverable unless authorized by statute or contract, and we will not disturb a district court's decision regarding an award of attorney fees absent an abuse of discretion. *City of Savage v. Formanek,* 459 N.W.2d 173, 177 (Minn.App.1990), *review denied* (Minn. Oct. 25, 1990). Here, the employment agreement authorized recovery of attorney fees, stating "[CB&S] agrees to pay, on a monthly basis, all fees and expenses (including reasonable attorneys fees) incurred by the Executive in connection with the enforcement of his rights under this Agreement."

CB&S argues that the award of attorney fees should be reversed because the judgment in Bruce's favor for breach of the employment agreement should be reversed. Additionally, CB&S argues that there is no basis for the district court to "sweep in the attorney fee clause" of the employment agreement, even if the parties extended the employment agreement by their conduct. According to CB&S there is no evidence in the record to establish specifically which terms in the employment agreement were extended. Because the jury's verdict in favor of Bruce on his breach-of-contract claim was not in error, we also affirm the related award of attorney fees. We reject CB&S's argument that the attorney-fee provision was exempted from the extension of the employment agreement. *See Fischer v. Pinske,* 309 Minn. 202, 205, 243 N.W.2d 733, 735 (1976) (noting that the contract as a whole was extended by the parties' conduct). Thus, we affirm the district court's award of attorney fees to Bruce.

## VI

David and Dorothy argue that the district court erred by dismissing their counterclaims under Minn.Stat. § 302A.467 (2004) and for breach of fiduciary duty.

Minn.Stat. § 302A.467 provides:

If ... an officer or director of the corporation violates a provision of this chapter, a court in this state may, in an action brought by a shareholder of the corporation, grant any equitable relief it deems just and reasonable in the circumstances and award expenses, including attorneys' fees and disbursements, to the shareholder.

The chapter requires that directors and officers of corporations act in a manner that the director or officer reasonably believes to be in the best interests of the corporation. *See* Minn.Stat. §§ 302A.251, subd. 1, .361 (2004). Additionally, an officer or director owes a fiduciary relationship to the corporation under common law. *In re Villa Maria, Inc.,* 312 N.W.2d 921, 922–23 (Minn.1981).

A court of equity is to be accorded broad latitude in fashioning remedies to meet the particular needs of each case. *See, e.g., City of Cloquet v. Cloquet Sand & Gravel, Inc.,* 312 Minn. 277, 279, 251 N.W.2d 642, 644 (1977); *Beliveau v. Beliveau,* 217 Minn. 235, 14 N.W.2d 360 (1944). As was observed in *Beliveau:*

A court of equity has the power to adapt its decree to the exigencies of each particular case so as to accomplish justice. It is traditional and characteristic of equity that it possesses the flexibility and expansiveness to invent new remedies or modify old ones to meet the requirements of every case and to satisfy the needs of a progressive social condition.

217 Minn. at 245, 14 N.W.2d at 366. We review the district court's exercise of equitable relief for abuse of discretion. *State v. Ambaye,* 616 N.W.2d 256, 261 (Minn. 2000).

In its March 17, 2004 order, the district court concluded that Bruce admitted to "acting in a manner contrary to the best interests of the Corporation by continuing to take substantial cash advances at a time when the Corporation was in acute financial difficulty." Further, the district court concluded that Bruce acted with "deliberate disregard for the best interests of the Corporation."

█ David and Dorothy argue that the district court abused its discretion by not granting them equitable relief after it concluded that Bruce acted contrary to the best interests of the company. Bruce argues that relief under Minn.Stat. § 302A.467 is discretionary, not mandatory. *See* Minn.Stat. § 302A.467 (stating that "a court … *may* … grant any equitable relief it deems just" (emphasis added)); *see also* Minn.Stat. § 645.44, subd. 15 (2004) (stating that " '[m]ay' is permissive"). Therefore, Bruce argues, even if the district court found that Bruce did not act in CB&S's best interests, the district court was not required to grant equitable relief. Bruce also argues that the record supports the district court's dismissal of David and Dorothy's counterclaims because the evidence shows that his actions did not harm the company or its shareholders and that David and Dorothy had "unclean hands" because they terminated Bruce without cause, eliminating his ability to repay the loans. But the district court did not adopt any of these arguments when it dismissed David and Dorothy's counterclaim.

While we agree with Bruce that the decision whether to grant equitable relief is discretionary, we conclude that under the facts of this case the district court abused its discretion by not granting David and Dorothy equitable relief. Bruce admitted that he did not act in CB&S's best interests by withdrawing money from the company, stating "but I needed to do what I needed to do to keep myself solvent." And the district court found that Bruce did not act in CB&S's best interests by taking withdrawals when the company was experiencing financial difficulty. In light of these findings, there was no basis for dismissal of David and Dorothy's counterclaims. Thus, we reverse and remand for the district court to grant David and Dorothy equitable relief.

█ We note that relief may include, but is not limited to, equitable forfeiture of the compensation that the jury awarded Bruce. "Any person acting in a fiduciary capacity is entitled to compensation for his services, when he acts in good faith and for the best interests of his beneficiary in diligently guarding and advancing the interests of the latter." *Backus v. Finkelstein*, 23 F.2d 357, 361 (D.Minn.1927). But "[a]ny variation from this necessary requirement carries with it a forfeiture of all compensation which otherwise might be due." *Id.; see also Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 385 (Mo. Ct.App.2000) (holding that a corporate officer is not entitled to compensation if breach of fiduciary duty is proved).

Accordingly, we reverse and remand for the district court to grant David and Dorothy equitable relief.

**VII**

█ Next, David and Dorothy argue that the district court erred by not distributing the trust assets to Bruce and his three siblings in separate, equal shares in accordance with article 4.01(4) of the trust agreement.

█ We review the district court's interpretation of an unambiguous written document de novo. *In re Trust Created by Hill*, 499 N.W.2d 475, 482 (Minn.App. 1993), *review denied* (Minn. July 15, 1993).

Where the language of the trust instrument is unambiguous, the intent of the settlor must be ascertained from the four corners of the agreement, without resort to extrinsic evidence of intent. *In re Trust Created Under Agreement with McLaughlin,* 361 N.W.2d 43, 44–45 (Minn. 1985). But where there is ambiguity as to the settlor's intent, the district court may admit extrinsic evidence. *See In re Trust of Campbell,* 258 N.W.2d 856, 864 (Minn. 1977). We apply a "clearly erroneous" standard of review "where critical evidence in the case turns on extrinsic evidence about the settlor's intent and disputed expert opinions about the language of the trust instrument." *Hill,* 499 N.W.2d at 482.

Article 4.01(4) of the trust agreement provides:

*Distribution on Termination of Employment.* My son intends to become a full-time employee of Carl Bolander & Sons Co. (the "Company") on July 1, 1994, pursuant to an Employment Agreement, dated as of May 3, 1994, by and between my son and the Company (the "Employment Agreement"), which Employment Agreement is attached hereto as Exhibit A. In the event that my son never commences such employment or ceases to be a full-time employee of the Company, or its successor corporation or corporations, at any time prior to March 31, 2000, for any reason other than the death of my son, the Disability (as defined in Section 7 of the Employment Agreement) of my son, the termination of my son's employment without Due Cause (as defined in Section 9 of the Employment Agreement) or the constructive termination of my son's employment (as described in Section 12 of the Employment Agreement), all shares of stock of the Company, or any successor corporation or corporations thereto, held in this trust for the benefit of my son shall be immediately distributed to my issue (including my son), per stirpes.

Provision 1.2 of the shareholder agreement provides:

*Time of Recapitalization.* The Recapitalization shall occur on a date to be determined by David, Dorothy and Bruce; provided, however, that in no event shall the Recapitalization occur on a date which is later than March 31, 2000. In no event shall the Recapitalization occur if, on the scheduled date of Recapitalization, Bruce is not a full-time employee of the Company, having been employed by the Company from the beginning of the Term of his Employment (as such terms are defined in the Employment Agreement) to the scheduled Recapitalization date. The parties agree that the Recapitalization shall take place on the earliest date at which they unanimously agree that the then-current financial condition of the Company would enable it to make required dividend payments on the preferred shares without negatively impacting the operation of its business.

The district court concluded that the employment agreement, shareholder agreement, and trust are part of an integrated plan and must be read together for whatever light one may shed upon the others. The district court found that article 4.01(4) of the trust agreement was ambiguous when read with provision 1.2 of the shareholder agreement. The district court explained, "The Trust instrument is incomplete, and therefore ambiguous, because it fails to address the possibility that its corporate control purpose might fail because the Corporation could not implement the restructuring prior to 31 March 2000."

After finding article 4.01(4) of the trust agreement ambiguous, the district court considered extrinsic evidence to determine the settlor's intent. David and Dorothy testified that they would have wanted the shares in the trust to be divided equally among their children if the restructuring failed for financial reasons prior to March 31, 2000. The district court found this testimony incredible. The district court also found that the trust was a key inducement for Bruce to leave his well-established law practice and return to Minnesota, and that Bruce would not have accepted the business-succession plan if this inducement did not exist or "if he thought that there was a realistic possibility it could be taken away from him, except by his choice or because of some malfeasance or criminal action on his part." Based on the evidence, the district court concluded that the settlor (David) would have intended that the gift to the Trust would fully vest in Bruce on March 31, 2000, regardless of CB&S's ability to implement the recapitalization if: (a) Bruce was employed by CB&S on March 31, 2000; or (b) Bruce's employment with CB&S has been terminated before March 31, 2000, because of death, disability, or termination without due cause.

David and Dorothy argue that the district court's findings are clearly erroneous. Bruce and the guardian argue that the district court erred by concluding that the trust agreement was incomplete and therefore ambiguous. Bruce and the guardian argue that "recapitalization was irrelevant to the operation of the Trust's distribution provision." They argue that Bruce is entitled to the trust assets because it is undisputed that Bruce commenced employment with CB&S pursuant to the employment agreement and remained a full-time employee of CB&S through March 31, 2000. Alternatively, Bruce and the guardian argue that if the trust agreement is ambigu-

ous, the district court's findings were not clearly erroneous.

We agree that the trust agreement, shareholder agreement, and employment agreement must be construed together. *See Farrell v. Johnson,* 442 N.W.2d 805, 807 (Minn.App.1989) (holding that instruments executed at the same time by the same parties relating to the same transaction are considered and construed together). But, contrary to the district court, we conclude that article 4.01(4) of the trust agreement is not incomplete—and therefore not ambiguous—when construed with provision 1.2 of the shareholder agreement. Article 4.01(4) of the trust agreement does not specifically refer to the recapitalization provision in the shareholder agreement. Article 4.01(4) of the trust agreement does list conditions that must be satisfied if the trust assets are to be distributed to David's issue per stirpes. Under article 4.01(4), trust assets were to be distributed to Bruce and his siblings only if (a) Bruce never commenced employment with CB&S; or (2) Bruce ceased to be a full-time employee of CB&S at any time prior to March 31, 2000, for reasons other than death, disability, termination of employment without due cause, or constructive termination. None of the enumerated circumstances occurred by March 31, 2000, and none of the enumerated circumstances is directly related to, contingent on, or otherwise linked to the recapitalization addressed in the shareholder agreement. Thus, we conclude that recapitalization was irrelevant to operation of the trust-distribution provision.

Accordingly, although the district court erred by concluding that the trust agreement was ambiguous, we affirm the district court's conclusion that Bruce is entitled to the trust shares; but we do so based solely on the plain language in the trust agreement.

.

## VIII

Bruce argues that the trial court erred by dismissing his claim for equitable relief under Minn.Stat. § 302A.751, subd. 1(b)(3) (2004), of the Minnesota Business Corporation Act.

Minn.Stat. § 302A.751 (2004) provides for judicial intervention and equitable remedies or dissolution of a corporation under enumerated circumstances, including when "the directors or those in control of the corporation have acted in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders or directors of a corporation that is not a publicly held corporation, or as officers or employees of a closely held corporation." *Id.*, subd. 1(b)(3). The phrase "unfairly prejudicial" is to be interpreted liberally. *See Pedro v. Pedro*, 463 N.W.2d 285, 288–89 (Minn. App.1990), *review denied* (Minn. Jan. 24, 1991). Unfair prejudice exists when a shareholder's reasonable expectations have been frustrated. *Berreman v. West Publ'g Co.*, 615 N.W.2d 362, 374 (Minn. App.2000), *review denied* (Minn. Sept. 26, 2000). For purposes of this section, "any written agreements, including employment agreements and buy-sell agreements, between or among shareholders or between or among one or more shareholders and the corporation are presumed to reflect the parties' reasonable expectations concerning matters dealt with in the agreements." Minn.Stat. § 302A.751, subd. 3a (2004).

The decision to grant equitable relief is discretionary. *See* Minn.Stat. § 302A.751, subd. 1 (stating that "a court *may* grant any equitable relief it deems just and reasonable in the circumstances" (emphasis added)). In determining whether to order equitable relief after finding that judicial intervention is warranted, the court must take into consideration the duty of all shareholders in a closely held corporation "to act in an honest, fair, and reasonable manner in the operation of the corporation and the reasonable expectations of all shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corporation and with each other." *Id.*, subd. 3a. This court will not disturb a trial court's grant of equitable relief unless it finds the trial court abused its discretion. *City of Cloquet v. Cloquet Sand & Gravel*, 312 Minn. 277, 279, 251 N.W.2d 642, 644 (1977).

In its March 17, 2004 order, the district court dismissed with prejudice Bruce's claim under Minn.Stat. § 302A.751. The district court found no evidence suggesting that David and Dorothy or CB&S acted fraudulently, illegally, or in an unfair prejudicial manner toward any other shareholder in that shareholder's capacity as shareholder, director, officer, or employee. The district court also concluded:

9. While [Bruce's] termination on 17 October 2000 was without contractual good cause, it was neither fraudulent, illegal, nor unfairly prejudicial to [Bruce] within the meaning of Minn. Stat. § 301A.751. The extensively negotiated and expertly drafted Employment Agreement gave the Corporation the unambiguous right to terminate [Bruce] without good cause. [Bruce] had a central role in negotiating and drafting the Employment Agreement. It is presumed to, and in fact does, reflect the parties' reasonable expectations. Minn. Stat. § 301A.751, subd. 3a. The fact is that the Corporation's exercise of its absolute contractual right to terminate [Bruce] without good cause does not impinge on any reasonable expectation [Bruce] may have had.

10. [Bruce] admits to acting in a manner contrary to the best interest of the Corporation by continuing to take

substantial cash advances at a time when the Corporation was in acute financial difficulty. He did so knowing that David Bolander disapproved of the practice and had told [Bruce] to stop. Further, he admits he did so for the purely selfish reason of maintaining his personal solvency. While these facts do not create contractual defenses to [Bruce's] claim that the Employment Agreement was breached when the Corporation failed to pay him what he was due under the contract, they undercut his claim to equitable relief under Minn. Stat. § 301A.751 stemming from his termination.

Bruce argues that he is entitled to relief under Minn.Stat. § 302A.751 as a matter of law because: (1) the verdict conclusively established that David and Dorothy and CB&S violated provisions of the employment agreement governing termination without due cause; (2) he had a reasonable expectation to the continued salary and bonuses under the employment agreement when he was terminated without due cause; and (3) his expectations were frustrated when he did not receive the specified compensation. CB&S argues that Bruce could have no reasonable, objective expectations other than those contained in the parties' written agreements. CB&S asserts, "[w]hile there are contractual severance payments that may apply in the event of termination, one thing is beyond doubt—Bruce could be terminated at any time for any reason and all parties knew and contractually agreed to that."

The district court did not abuse its discretion in denying Bruce equitable relief. While Bruce may be entitled to relief on a contractual basis under the employment agreement if terminated without due cause, the district court did not err by concluding that he "undercut" his claim under Minn.Stat. § 302A.751 when he took withdrawals from CB&S that were not in the company's best interests.

## IX

Bruce argues that the district court erred in dismissing his motion to reopen the record, and consequently a new trial is warranted.

■ "New trials on the ground of newly discovered evidence are granted by appellate courts with much caution. The matter rests largely in the discretion of the trial court." *Wood v. Wood,* 140 Minn. 130, 132, 167 N.W. 358, 359 (1918). Bruce is required to show that the new evidence is not "cumulative ... and that it is likely to produce a different result." *Vikse v. Flaby,* 316 N.W.2d 276, 284 (Minn.1982).

Bruce argues that the district court erred by not reopening the record when he presented new evidence. *See* Minn. R. Civ. P. 59.01(d) (delineating that a new trial may be granted for newly discovered material evidence, if the evidence could not, with reasonable diligence, have been found and produced at trial). The "new evidence" that Bruce proposed to introduce was a response letter from CB&S on Bruce's request to inspect "certain documents" that a corporation is required to maintain and which a shareholder has the right to inspect under Minn.Stat. § 302A.461 (2004). In the letter, CB&S requested that Bruce make "requested representations" before CB&S would provide the documents. Bruce argues that CB & S's letter "is evidence in further support of Bruce's § 302A.751 claims."

On this record, the evidence is cumulative and would not likely produce a different result. Thus, the district court did not abuse its discretion by denying Bruce's motion to reopen the record.

## X

Bruce argues that the district court erred by granting summary judgment rejecting his shareholder-oppression claim, under which he alleged that he was entitled to recapitalization pursuant to the shareholder agreement.

On appeal from summary judgment, this court asks whether there are any genuine issues of material fact and whether the district court erred in applying the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). "Summary judgment is not a trial of issues of fact. It is a proceeding designed to determine if issues of fact exist." *Corwine v. Crow Wing County*, 309 Minn. 345, 361, 244 N.W.2d 482, 491 (1976).

 Determining whether a contract is ambiguous is a legal question. *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn. 1979). Language is ambiguous if it is reasonably subject to more than one interpretation. *Halverson v. Halverson*, 381 N.W.2d 69, 71 (Minn.App.1986). When interpreting a contract, "the language found in a contract is to be given its plain and ordinary meaning." *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 67 (Minn. 1979).

 Bruce argues that the district court (1) misconstrued the financial tests in provision 1.2 of the shareholder agreement as prerequisites to a recapitalization; (2) incorrectly found that Bruce lacked evidence that CB&S could afford to recapitalize without negatively affecting its business operations; and (3) denied Bruce the opportunity to present evidence that the recapitalization was a reasonable expectation after March 31, 2000, and that CB&S and David and Dorothy defeated that expectation by terminating him without due cause.

At issue is provision 1.2 in the shareholder agreement, set out in relevant part in Part VII *supra*. This provision further provided:

Unless the parties unanimously agree otherwise, the Company shall be deemed able to make required dividend payments on the preferred shares without negatively impacting the operation of its business if either of the following conditions is met: (a) the appraised value of the Company's common shares used in connection with purchases and sales thereof by the Company Employee Stock Ownership Plan (the "ESOP") as of any annual appraisal is at least $25.00 per share; or (b) for two straight fiscal years the net income after taxes of the Company has exceeded four (4) times the aggregate dividends that would be payable on the preferred shares, determined based upon a recommendation of an independent appraiser pursuant to Section 1.3(b)(i) below.

Bruce argues that the district court erred by interpreting this provision as "unambiguous" and by concluding that the only possible meaning is that recapitalization could never take place unless one of the financial conditions (ESOP value or net income) was met. By contrast, Bruce argues that "the Agreement requires that a recapitalization must take place by March 31, 2000 at the latest, but it could occur earlier if Bruce [Bolander] can show that the financial conditions were fulfilled." According to Bruce, the financial tests are relevant only in deciding whether CB&S and David and Dorothy must consent to a recapitalization earlier than March 31, 2000.

CB&S argues that provision 1.2 of the shareholder agreement clearly provides that certain financial criteria had to be met in order for the recapitalization to occur and that if those criteria were not met by

March 31, 2000, the recapitalization would not occur because "in no event" could the recapitalization occur after that date.

Here, both parties' readings of provision 1.2 of the shareholder agreement are plausible. Thus, we conclude that the shareholder agreement is ambiguous. There is a genuine issue of material fact as to whether the parties intended for the recapitalization to occur on March 31, 2000, regardless of whether the financial conditions were met, or whether the financial conditions had to be met by March 31, 2000, if the recapitalization were ever to occur. Therefore, the district court erred by granting summary judgment on Bruce's claim alleging breach of the shareholder agreement. Because we reverse on the basis of the ambiguity in the shareholder agreement, we do not reach Bruce's other arguments.

## XI

Bruce argues that in the event this court reverses the jury verdict and remands for a new trial, the district court should admit David and Dorothy's amended wills and evidence of their total compensation. Because we affirm the jury verdict, we do not address this argument.

## XII

Bruce argues that the district court erred by awarding CB & S attorney fees for collecting on Bruce's promissory note because he never disputed this claim.

■■■■ Attorney fees are not recoverable unless authorized by statute or contract, and we will not disturb a district court's decision regarding an award of attorney fees absent an abuse of discretion. *City of Savage v. Formanek*, 459 N.W.2d 173, 177 (Minn.App.1990), *review denied* (Minn. Oct. 25, 1990). In determining the size of the fee, the district court must consider the "time and effort required, novelty or difficulty of the issues, skill and standing of the attorney, value of the interest involved, results secured at trial, loss of opportunity for other employment, taxed party's ability to pay, customary charges for similar services, and certainty of payment." *Jadwin v. Kasal*, 318 N.W.2d 844, 848 (Minn.1982). "[T]he reasonable value of attorneys' fees is a question of fact, and the findings of the [district] court must be upheld by a reviewing court unless clearly erroneous." *Amerman v. Lakeland Dev. Corp.*, 295 Minn. 536, 537, 203 N.W.2d 400, 400–01 (1973) (citation omitted).

■■■■ In its March 17, 2004 order, the district court concluded that CB&S had a contractual right to an award of its costs of collection including reasonable attorney fees relating to the promissory note, and instructed CB&S to submit a petition for an award of such fees. Following submission, the district court stated in its posttrial order:

> The Corporation seeks an award of fees and expenses of $115,000. I conclude that this amount is not reasonable in light of the limited nature of the dispute involving the notes. Based on my 22 years of experience as a lawyer involved in commercial litigation on behalf of creditors and my 13 years as a trial court judge, I find that the fees and expenses for the collection of the notes through litigation conducted by similarly experienced and talented counsel could not reasonably exceed $40,000.

Bruce argues that CB&S incurred no costs for enforcing the promissory note because Bruce did not dispute that claim. But Bruce refused CB&S's requests to repay the loan. We conclude that the district court's finding that CB&S incurred $40,000 in attorney fees for collecting on the promissory note was not unreasonable.

Thus, the district court did not abuse its discretion by awarding CB&S attorney fees.

## DECISION

We reverse the district court's dismissal of David and Dorothy Bolander's claims under Minn.Stat. § 302A.467 and for breach of fiduciary duty, and remand for the district court to grant equitable relief. Additionally, the district court erred in granting summary judgment on Bruce Bolander's claim regarding recapitalization under the shareholder agreement. Therefore, we reverse and remand this claim for trial. We otherwise affirm the district court on all other issues.

**Affirmed in part, reversed in part, and remanded.**

MINGE, Judge, concurring specially.

I join in the decision and opinion of the court and concur specially to address the question of an officer's fiduciary duty to a corporation. A material breach of a fiduciary duty should constitute a material breach of an employment contract between an officer and the corporation. Just as Minnesota recognizes that "[t]he obligations of good faith, diligence, reasonableness, and care prescribed by the Uniform Commercial Code may not be disclaimed by agreement," Minn.Stat. § 336.1–302(b) (2004), so too, a corporate officer's fiduciary duty should not be subject to explicit or implicit disclaimer and should be an implied term of every contract between the officer and the corporation.

Minnesota's Business Corporation Act recognizes that officers have a duty of "good faith" to the corporation. Minn. Stat. § 302A.361 (2004). "Good faith" is defined as "honesty in fact in the conduct of the act or transaction concerned." Minn.Stat. § 302A.011, subd. 13 (2004). This obligation of good faith is not subject to modification in the articles or bylaws of the corporation. See Minn.Stat. §§ 302A.111, .251, subd. 4(b) (2004).

Although analogous, a fiduciary duty goes beyond the good-faith focus on honesty to encompass loyalty and care. See Wenzel v. Mathies, 542 N.W.2d 634, 641 (Minn.App.1996) (noting that fiduciary duty encompasses a duty to act "fairly and evenly"); Black's Law Dictionary, 523 (7th ed.1999) (defining fiduciary duty as "a duty to act with the highest degree of honesty and loyalty toward another person"). Although this state's corporation law allows for limitations on a director's fiduciary duty, such limits must be in the articles of incorporation. Minn.Stat. § 302A.111, subd. 4(u) (2004). And the articles cannot eliminate director liability for the duty of loyalty. Minn.Stat. § 302A.251, subd. 4(a) (2004). Officer conduct should be subject to parallel, if not more, exacting requirements.

Nothing in the record in this case indicates that CB&S's articles of incorporation attempt to limit an officer's liability. As CB&S argues, other jurisdictions have found that corporate officers have an implied fiduciary duty that is a term of their contract with the corporation and cannot be disclaimed. See Backus v. Finkelstein, 23 F.2d 357, 361 (D.Minn.1927); Prozinski v. Ne. Real Estate Servs., LLC, 59 Mass. App.Ct. 599, 797 N.E.2d 415, 424 (2003); Zakibe v. Ahrens & McCarron, Inc., 28 S.W.3d 373, 385 (Mo.Ct.App.2000).

I would hold that Bruce owed a fiduciary duty to CB&S as a corporate officer and that to the extent his conduct in unilaterally borrowing almost $350,000 from CB&S constituted a material breach of his fiduciary duty, he violated his employment contract with CB&S.