# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-1352

_____

Hortica-Florists' Mutual Insurance Company

*Plaintiff - Appellee*

v.

Pittman Nursery Corporation; Donna Sue Pittman King

*Defendants - Appellants*

_____

No. 12-1434

_____

Hortica-Florists' Mutual Insurance Company

*Plaintiff - Appellant*

v.

Pittman Nursery Corporation; Donna Sue Pittman King

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Arkansas - El Dorado

_____

Submitted: April 9, 2013

Filed: September 6, 2013 (Corrected: 09/09/2013)

_____

Before RILEY, Chief Judge, BYE and BENTON, Circuit Judges.

_____

BYE, Circuit Judge.

"All happy families are alike; each unhappy family is unhappy in its own way."[1] This case presents to us the affairs of the uniquely unhappy Pittman family of Magnolia, Arkansas. A struggle for control of the family business spawned five lawsuits. Hortica-Florists' Mutual Insurance Company (Hortica), insurer for Pittman Nursery Corporation (PNC), filed a declaratory judgment action to clarify its obligation to provide a defense. PNC filed five counter-claims. The district court ruled Hortica had a duty to defend three of the five lawsuits. The court dismissed two of PNC's five counter-claims via pre-verdict judgment as a matter of law (JAML). The remaining claims, for breach of contract, negligence, and bad faith, were tried to a jury. The jury returned a verdict in favor of PNC on the bad faith and negligence claims, but the district court granted Hortica's post-verdict JAML motion.

PNC appeals. It argues the district court erred by (1) denying PNC a mandatory award of attorneys' fees; (2) granting Hortica's post-verdict JAML motion; (3) granting pre-verdict JAML on PNC's breach of fiduciary duty and punitive damages claims; and (4) excluding relevant evidence. We have carefully examined the rather mountainous factual record, and when all is said and done, we reverse the district court's denial of PNC's motion for attorneys' fees and affirm on all remaining issues.

_____

[1]Leo Tolstoy, Anna Karenina 1 (Richard Pevear & Larissa Volokhonsky trans., Viking Penguin 2001) (1877).

# I. Background

Hortica is an insurance company located in Edwardsville, Illinois. PNC, located in Magnolia, Arkansas, sells trees, shrubs, and plants to large and small retailers nationwide. PNC is part of a larger horticultural business owned by Mickey H. Pittman and her three adult children: Donna Pittman King, who is president of PNC, David Pittman, and Dixie Pittman. Beginning in 2007, a family feud pitted Donna against her own mother and siblings, as well as Mr. Dawood Aydani, the former president of PNC. The parties filed five lawsuits, which we summarize:

1. <u>Muniz, et al. v. Pittman Properties, et al.</u>[2]: in this suit, the most complex of the five, members of PNC's Mexican migrant workforce accused Aydani of abusing, threatening, and extorting money from them. Aydani allegedly required each migrant worker to pay him $1,000 before he agreed to sign the paperwork which allowed the employees to renew their work visas and return to PNC the following year. The plaintiffs claimed because they had to pay this money, their wages did not meet the minimum wage standards required by the Fair Labor Standards Act (FLSA). 29 U.S.C. § 206. They also contended Aydani's repeated extortion amounted to racketeering actionable under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. §§ 1961-1968. Most of the Pittman family supported Aydani. Pittman King took the side of the migrant workers. She fired Aydani, but the other family members promptly re-hired him to work in other branches of the family business.

2. <u>Aydani v. Pittman Nursery Corp.</u>: Aydani sued PNC, alleging wrongful termination, unpaid commissions, tortious interference with his 18% interest in Pittman Properties Limited Partnership #1, and violation of the Arkansas Deceptive Trade Practices Act. <u>See</u> Ark. Code Ann. §§ 4-88-107.

---

[2]Some documents in the record refer to this suit as the <u>Montize</u> litigation.

3.      Hunter v. Pittman Nursery Corp.: John-Michael Hunter, Aydani's step-son, was also fired. He, too, filed a suit for wrongful termination.

4.      Pittman Properties Limited Partnership #1 v. Pittman Nursery Corp., et al.: an entity controlled by the Pittman family members aligned with Aydani sought to remove PNC from its land.

5.      Feazell v. Pittman Properties Limited Partnership, et al.: brought by a trustee of PNC against Pittman King, David Pittman, and Mickey Pittman, the suit sought to evict Pittman King and PNC for non-payment of rent.

PNC began purchasing insurance from Hortica in 2002. PNC purchased the "Hortica Greenhouse Grower Business Package," which included the following relevant policies:

1.      Commercial General Liability Policy (CGL): provided primary, occurrence-based[3] coverage with a policy limit of $2 million.

2.      Business Excess Policy (Excess): provided occurrence-based, $5 million-per-year coverage. PNC had this policy from 2002 through 2005.

3.      Employment Practices Liability Endorsement (EPL): a secondary, claims-made policy covering wrongful employment practices. It had an aggregate limit of $100,000. The EPL coverage was "eroding," meaning attorneys' fees and defense costs are deducted from the amount of available coverage as those fees and costs are incurred. (The CGL and Excess policies are non-eroding.)

---

[3]In occurrence-based coverage, the insured may receive coverage for incidents which arise during the insurance coverage period, regardless of when those claims are reported. In claims-based coverage, claims must be reported during the term of the policy to be eligible for coverage. See Tr. 300-01.

4. Employee Dishonesty Endorsement (ED): covered $5,000 per occurrence for losses resulting from employee dishonesty.

PNC asked Hortica to provide a defense in all five lawsuits. Hortica hired the law firm of Cross, Gunter, Witherspoon, & Galchus, P.C. (Cross Gunter) to defend PNC,[4] but still questioned its obligation to provide a defense. The parties continued to litigate the underlying lawsuits on the merits. On December 26, 2007, Hortica filed a motion for a declaratory judgment to clarify its coverage obligations. PNC responded by filing counter-claims for negligence, bad faith, breach of fiduciary duty, and breach of contract. PNC also claimed it was entitled to punitive damages for Hortica's conduct. PNC's counter-claims rested on a theory that Hortica knew it was obligated to defend PNC in Muniz, Aydani, and Hunter, but refused to do so.

On March 2, 2010, the district court ruled Hortica had a duty to defend and indemnify PNC under the CGL policy in Muniz and under the EPL policy in Hunter. On August 30, 2010, the court ruled Hortica had a duty to defend and indemnify PNC under the EPL policy in Aydani.[5] Only PNC's counter-claims remained. The district court granted JAML on the breach of fiduciary duty and punitive damages claims. See Fed. R. Civ. P. 50(a)(1). The remaining claims—bad faith, negligence, and breach of contract—were tried to a jury.

The jury found Hortica was negligent in its handling of PNC's insurance claims and awarded PNC $50,000 in damages. It also concluded Hortica acted in bad faith and awarded PNC $1.3 million in damages. The jury did not find for PNC on its breach of contract claim. Hortica moved for JAML on PNC's negligence and bad

---

[4]In February 2009, PNC fired Cross Gunter and hired Locke Lord Bissell & Liddell LLP ("Locke Lord"). See Br. in Supp. of Mot. to Compel Payment of Defense Costs, R. Doc. 152, at 4.

[5]The parties agreed Hortica owed no duty to defend in Pittman Properties Limited and Feazell. Those suits are not part of this appeal.

faith claims. On January 10, 2012, the district court granted Hortica's JAML motion, concluding the jury's verdict with respect to PNC's negligence and bad faith claims was not supported by substantial evidence.[6] PNC appealed and now urges the district court erred by (1) denying PNC's claim for attorneys' fees in defending Hortica's declaratory judgment action; (2) granting post-verdict JAML on PNC's negligence and bad faith claims; (3) granting pre-verdict JAML on PNC's breach of fiduciary duty and punitive damages claims; (4) excluding relevant evidence in support of its counter-claims.

## II. Attorneys' Fees

The district court ordered Hortica to pay PNC's attorneys additional fees for their defense in Muniz, but denied PNC's other claims for reimbursement, including, as relevant here, its claim for payment for defending the declaratory judgment action. PNC claims Arkansas law mandates the payment of fees in this instance.

In a diversity case such as this one, see 28 U.S.C. § 1332, we employ state substantive law. See HOK Sport, Inc. v. FC Des Moines, L.C., 495 F.3d 927, 934 (8th Cir. 2007). State law governing attorneys' fees is generally "substantive." See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 259 n.31 (1975); Ferrell v. West Bend Mut. Ins. Co., 393 F.3d 786, 796 (8th Cir. 2005). Accordingly, Arkansas law determines whether PNC is entitled to additional attorneys' fees. We

---

[6]PNC had filed an alternative motion for a new trial. Federal Rule of Civil Procedure 50(c)(1) requires a court which grants a motion for judgment as a matter of law to conditionally rule on the alternative motion for a new trial, in case the court's grant of judgment as a matter of law is vacated or reversed by an appellate court. The district court conditionally denied Hortica's motion. In other words, the district court ruled if this court reverses its grant of JAML, Hortica is not entitled to a new trial. Hortica conditionally cross-appeals this conditional denial.

review the district court's interpretation of Arkansas law de novo.[7]  Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991).

We follow Arkansas's rules of statutory construction when interpreting its law. Gershman v. Am. Cas. Co. of Reading, Pa., 251 F.3d 1159, 1162 (8th Cir. 2001). When Arkansas courts consider the meaning of a statute, they begin by observing its plain language, giving the words their ordinary meaning.  Mamo Transp., Inc. v. Williams, 289 S.W.3d 79, 83 (Ark. 2008) (citation omitted).  They construe the statute so no word is left void, superfluous, or insignificant.  Id.  If the language of the statute is clear, there is no need to turn to the rules of statutory construction.  Id.

The Arkansas statute we are called upon to consider provides,

[i]n all suits in which *the judgment or decree of a court is against a life, property, accident and health, or liability insurance company*, either in a suit by it [to cancel, lapse, or change the conditions of the policy] . . . *or in a suit for a declaratory judgment under the policy* . . . the company *shall* also be liable to pay the holder of the policy all reasonable attorney's fees for the defense or prosecution of the suit, as the case may be.

Ark. Code. Ann. § 23-79-209(a) (emphasis added).  The district court concluded, and Hortica now argues, PNC may not recover attorneys' fees for Hortica's declaratory judgment action because "PNC did not prevail on any of its claims in the case at bar." Mem. Op. & Order of Jan. 10, 2012, R. Doc. 257, at 16.  We cannot agree with this

---

[7]Hortica misstates the standard of review as abuse of discretion. Appellee/Cross-Appellant's Br. 59, 61.  The case it cites for this proposition, State Farm Mutual Auto Insurance Co. v. Brown, 892 S.W.2d 519, 524 (Ark. Ct. App. 1995), states judges have wide discretion to determine the *size* of attorneys' fees once it has been decided a party is entitled to them.  The decision to award attorneys' fees in the first place, however, is controlled by statute, and accordingly, our review is de novo.

reasoning because a party's ability to obtain fees under § 23-79-209(a) does not depend on its success with respect to any declaratory counter-claims it has filed. See S. Farm Bureau Cas. Co. v. Watkins, 386 S.W.3d 6, 8, 11 (Ark. Ct. App. 2011) (stating, in a case where the policyholder lost on his declaratory counter-claims, that a court's declaration an insurance company has a duty to defend entitles the policyholder to attorneys' fees). To determine whether PNC is entitled to fees, we must simply consider the statute in light of the facts before us and decide whether PNC has satisfied the statutory requirements.

We believe PNC has done just that. It is undisputed Hortica is a "liability insurance company" and PNC is the "holder of the policy." A declaratory judgment gives courts the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Ark. Code Ann. § 16-111-103(a). The purpose of a declaratory judgment is "to avoid 'uncertainty and insecurity with respect to rights, status, and other legal relations.'" Newcourt Fin. Co. v. Canal Ins. Co., 15 S.W.3d 328, 331-32 (Ark. 2000) (opinion of L.R. Smith, J.) (quoting Ark. Code Ann. § 16-111-102(b)). In the insurance context, a declaratory judgment "is typically used to determine the obligations of the insurer under a policy of insurance." S. Farm Bureau Cas. Ins. Co. v. Krouse, 375 S.W.3d 763, 767 (Ark. Ct. App. 2010). Hortica's Second Amended Complaint doubtless meets this definition. See Second Am. Compl., R. Doc. 77, at 42 (asking the court to "adjudicate and declare the rights of the parties" and declare that "Hortica has no obligation to defend Pittman Nursery"). Accordingly, Hortica brought a declaratory judgment action. And finally, by declaring Hortica was, in fact, obligated to defend PNC in Muniz, Aydani, and Hunter, the district court rendered judgment against an insurance company. Newcourt Fin. Co., 15 S.W.3d at 332; Watkins, 386 S.W.3d at 11. We therefore have little trouble concluding § 23-79-209(a) requires Hortica to pay PNC attorneys' fees for defending Hortica's declaratory judgment action. At the same time, the statute does not provide PNC fees for the counter-claims it brought in the declaratory judgment action because there was no "judgment . . . against a . . . liability insurance

-8-

company" with respect to those unsuccessful claims. Ark. Code. Ann. § 23-79-209(a).

We reverse the district court's denial of fees and remand for a hearing to determine the proper amount of fees Hortica must pay to PNC for its defense in the declaratory judgment suit.[8]

## III. Bad Faith and Negligence Claims

An insurance company owes its insured "the duty to act in good faith, and also the duty to act without negligence." S. Farm Bureau Cas. Ins. Co. v. Parker, 341 S.W.2d 36, 40 (Ark. 1961) (emphasis removed). PNC advances numerous ways in which Hortica's conduct violated these duties and contends the district court wrongly granted post-verdict JAML in Hortica's favor.

We review the district court's grant of JAML de novo. In re Prempro Prods. Liab. Litig., 586 F.3d 547, 571 (8th Cir. 2009). "In entertaining a motion for judgment as a matter of law, the court 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). JAML is appropriate "when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party." Ehrhardt v. Penn Mut. Life Ins. Co., 21 F.3d 266, 269 (8th Cir. 1994) (internal quotation and citation omitted).

---

[8]Hortica argues PNC has provided "no basis" for the district court to determine the amount of fees attributable to PNC's declaratory judgment suit defense because PNC combined its billing statements for defending the declaratory suit with billing statements in the underlying Muniz litigation. On remand, we instruct PNC to provide documents which segregate hours spent on the declaratory and underlying lawsuits.

A.    Elements of Bad Faith and Negligence

"Arkansas recognizes a claim for bad faith when 'an insurance company affirmatively engages in dishonest, malicious, or oppressive conduct in order to avoid a just obligation to its insured.'" Selmon v. Metro. Life Ins. Co., 277 S.W.3d 196, 201 (Ark. 2008) (quoting Columbia Nat'l Ins. Co. v. Freeman, 64 S.W.3d 720, 723 (Ark. 2002)). "The standard for establishing a claim for bad faith is rigorous and difficult to satisfy." Unum Life Ins. Co. v. Edwards, 210 S.W.3d 84, 87 (Ark. 2005). As long as the insurer is acting in good faith, negligence or bad judgment alone are not enough to sustain a bad faith claim. Selmon, 277 S.W.3d at 201. Nor is mere denial of a claim; there must be affirmative misconduct. Id.

"Although an insurer's actions, or inaction as the case may be, may not amount to a claim for bad faith, those same actions or inactions may support a claim . . . in tort for defective performance (negligence)." Reynolds v. Shelter Mut. Ins. Co., 852 S.W.2d 799, 802 (Ark. 1993). "Negligence is defined as the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do, under circumstances similar to those shown by the evidence." Scully v. Middleton, 751 S.W.2d 5, 5 (Ark. 1988). "[B]efore a negligent act may be used as the basis to recover damages, there must be a showing that the negligent act proximately caused the damages sustained and that such damages were reasonably foreseeable." Id. at 6. An insurance company can act in good faith and still be negligent. Parker, 341 S.W.2d at 41.

B.    Specific Allegations of Misconduct[9]

Counsel appointed by an insurer to defend an insured often face a conflict of interest.  "Even the most optimistic view of human nature requires us to realize that an attorney employed by an insurance company will slant his efforts, perhaps unconsciously, in the interests of his real client[,] the one who is paying his fee and from whom he hopes to receive future business[:] the insurance company." U.S. Fid. & Guar. Co. v. Louis A. Rosser Co., 585 F.2d 932, 938 n.5 (8th Cir. 1978).  The gravamen of PNC's bad faith and negligence arguments is Hortica exploited this conflict by manipulating the defense it provided to PNC to escape its obligations under the policies.  PNC cites six instances of such manipulation.  We review each instance individually.

   1.    Appointment of Counsel

PNC argues Hortica *assigned* Cross Gunter to represent PNC, despite PNC's "absolute right" to choose its own counsel.  Appellant/Cross-Appellee's Br. 35.  Hortica counters it had no prior relationship with Cross Gunter and the firm was well qualified to represent PNC.  Arkansas law does not directly address this question, but

---

[9]Hortica argues Arkansas law allows an insured to pursue bad faith or negligence claims against a third-party insurer only if the insurer fails to settle a claim within the policy limits.  See, e.g., Emp'rs Equitable Life Ins. Co. v. Williams, 665 S.W.2d 873, 874 (Ark. 1984).  Because Muniz and Hunter were settled within the policy limits—Muniz for $600,000 and Hunter for $8,000, see Tr. 510-11—and Aydani was dismissed without any settlement payment, Hortica argues it cannot be subject to a bad faith claim.  PNC responds Arkansas law allows bad faith and negligence claims even if the underlying claim was settled at or below the policy limit.  See Switzer v. Shelter Mut. Life Ins. Co., 208 S.W.3d 792, 800-02 (Ark. 2005) (analyzing the merits of a bad faith claim against a third-party insurer who settled the underlying claim at the policy limit).  Because we conclude PNC's negligence and bad faith allegations fail on their merits, we do not address this matter.

two federal courts have held the insured has a right to select its own counsel in cases where an insurer-appointed counsel would face a conflict of interest. Union Ins. Co. v. The Knife Co., 902 F. Supp. 877, 881 (W.D. Ark. 1995); Northland Ins. Co. v. Heck's Serv. Co., 620 F. Supp. 107, 108 (E.D. Ark. 1985). But even assuming Arkansas law provides PNC the right to choose its own counsel, PNC presents no evidence Hortica chose Cross Gunter out of malice or dishonesty. Nor does PNC explain how its inability to choose proximately caused its harm. We are not anxious to infer bad faith or negligence in such speculative circumstances. See Wheeler v. Bennett, 849 S.W.2d 952, 958 (Ark. 1993) (declining to award recovery where cause of damages was conjectural).

2.      "EPL Only" Coverage

PNC next claims Hortica instructed Cross Gunter to "steer" its defense of PNC away from the $2 million, non-eroding CGL policy and towards the $100,000, eroding EPL policy. PNC cites several record documents which it claims establish this finesse. See Appellant/Cross-Appellee's App. 13:3242-43 (case log entry by Hortica employee); id. 17:4428 (line on attorney's bill referencing conference with Hortica Vice President); id. 18:4791 (letter from Hortica Vice President stating the EPL policy is of "primary interest" to PNC). They do not. The documents contain no "smoking gun"—indeed, barely a hint—of Hortica's alleged ostrich-like blindness regarding the CGL policy. The documents to which PNC points simply do not provide strong support for its claim.

3.      Disclosure of CGL Policy

Next, PNC claims Hortica agreed with Cross Gunter not to disclose the CGL policy to counsel for the Muniz plaintiffs, "despite [PNC's] desire for an early settlement." Appellant/Cross-Appellee's Br. 36. It is not altogether clear why this matters. In Arkansas, an insurer is not required to accept a demand from the insured

-12-

that the case be settled simply because the insured prefers to settle. Willett's Plumbing Co. v. Nw. Nat. Cas. Co., 548 S.W.2d 830, 831 (Ark. 1977). Hortica did not need to accommodate PNC's druthers. And further, just two months elapsed between the agreement not to voluntarily disclose the CGL policy and the complaint in the declaratory judgment action, to which a copy of the CGL policy was attached and therefore accessible to the Muniz plaintiffs. Compare Appellant/Cross-Appellee's App. 13:3242 (case entry recording agreement on October 24, 2007), with Compl., R. Doc. 1 (original complaint filed on December 26, 2007). PNC does not explain the significance of this two-month gap, and we see none.

    4.    Negligent Supervision Pleading Amendment in Muniz and the CGL Policy

On November 19, 2008, counsel for the Muniz class announced his intention to amend his complaint to add a claim for negligent supervision for PNC's failure to adequately supervise Aydani. See Appellant/Cross-Appellee's Add. L. Arkansas law requires an insurer to provide coverage and a legal defense when a complaint alleges the insured negligently hired or supervised an employee who subsequently committed an intentional tort. Silverball Amusement, Inc. v. Utah Home Fire Ins. Co., 842 F. Supp. 1151, 1165 (W.D. Ark. 1994), aff'd, 33 F.3d 1476 (8th Cir. 1994) (per curiam). The attorney sought PNC's consent to amend the complaint. See Fed. R. Civ. P. 15(a)(2). It reasoned although the claim would provide another basis for liability against PNC, it would trigger Hortica's duty to defend and indemnify PNC. Jess Sweere, attorney for PNC, refused the request.[10] PNC now contends Sweere's refusal to consent to the amendment constitutes further "steering" the case to ensure any recovery by the Muniz class would be grounded on a theory not covered by the CGL policy.

---

[10]The district court eventually granted the motion to amend. See Order Granting Mot. to Am. Compl., No. 1:07-cv-01073-RTD, R. Doc. 42.

We disagree.  In a file memorandum, Sweere states he objected to the request because the exclusion prohibiting coverage for intentional acts in Silverball referred to acts by "*the* insured" (i.e., the company-policyholder).  Appellant/Cross-Appellee's App. 12:3024.  The insurer in Silverball relied on a case with nearly the exact same facts, except the applicable exclusion said "*any* insured."  842 F. Supp. at 1158 (citing All Am. Ins. Co. v. Burns, 971 F.2d 438, 440 (10th Cir. 1992)).  The court stated had the insurance policy language in Silverball said "*any* insured," the employee would have been considered an insured, the exclusion would have been triggered, and there would have been no duty on behalf of the insurance company.  The CGL policy contains an exclusion denying coverage for loss caused by dishonest, fraudulent, criminal, or malicious acts committed by "*any* insured," Appellant/Cross-Appellee's App. 11:2693, thereby bringing Aydani within the exclusion.  Put differently, Sweere resisted the amendment because it would not provide any additional insurance coverage, but would instead add an additional claim for liability against *only PNC* for negligent supervision of Aydani.  This is a reasonable tack to take.  We see no basis for a negligence or bad faith claim.

5.    Cross Gunter's Position Regarding CGL Coverage

PNC claims Cross Gunter ultimately took the formal, written position that "'augur[ed] for no [CGL] coverage.'"  Appellant/Cross-Appellee's Br. 36 (quoting Roser, 585 F.2d at 938).  It points to several emails and Cross Gunter's draft memo opposing the amended complaint in Muniz.  We have reviewed these documents and are not persuaded.  Nowhere does Cross Gunter state there was no CGL coverage.  Moreover, "an insurer's refusal to pay a claim cannot constitute wanton or malicious conduct when an actual controversy exists with respect to liability under the policy."  Watkins, 370 S.W.3d at 857 (citing Farm Bureau Ins. Co. of Ark. v. Running M Farms, Inc., 237 S.W.3d 32, 42 (Ark. 2006)).  The CGL policy protected against "property damage" and "bodily injury."  Appellant/Cross-Appellee's App. 10:2583.  The policy defined "property damage" as, *inter alia*, "[l]oss of use of tangible

-14-

property that is not physically injured." Id. 10:2595. Because no Arkansas court had yet ruled on the issue whether money constitutes "tangible property" for insurance purposes, there existed an "actual controversy" with respect to this issue. The district court concluded money is tangible property, but as the court itself observed, "simply because [PNC] prevailed in the declaratory judgment action brought by Hortica does not mean that the action was meritless." Mem. Op. & Order of Jan. 12, 2012, R. Doc. 257, at 12. Because a legitimate controversy existed as to whether money was tangible property, and therefore the migrant workers suffered "property damage" within the meaning of the CGL policy, Hortica's refusal to pay a claim under the CGL policy cannot constitute affirmative misconduct under Arkansas law. Nor was it negligent. PNC's argument is without merit.

6.      Hortica's Position Regarding Settlement Negotiations

PNC argues Hortica refused reasonable settlement negotiations until its duty to defend was decided. See Luke v. Am. Family Mut. Ins. Co., 476 F.2d 1015, 1023 (8th Cir. 1973) (en banc) ("[N]otwithstanding an honest belief by the insurer that the policy is not in effect, the company must in good faith consider offers for settlement within the limits of the insurance policy."). Hortica, according to PNC, had a duty to negotiate, yet no evidence shows Hortica gave any consideration to PNC's offers to settle.

As explained above, in Arkansas, an insurer is not required to capitulate simply because a policyholder prefers it. Willett's Plumbing Co., 548 S.W.2d at 831. Moreover, the Muniz plaintiffs' settlement offer was $1.95 million, just below the policy maximum. Ultimately, however, only twenty-five plaintiffs came forward with evidence of extortion in Muniz. The case settled for $600,000,[11] well below the

---

[11]Of this sum, less than $50,000 constituted damages distributed to the class. The remaining $550,000 went directly to the Muniz plaintiffs' attorneys. Tr. 510-11.

plaintiffs' demand.  It appears, then, Hortica was prudent not to cede to the initial offer.  Once again, PNC's argument falls flat.

7.    Summary

We have canvassed the record and found smoke but no fire.  PNC may be able to show only that it was denied the right to choose its own independent counsel.  On that matter, PNC provides no persuasive evidence indicating affirmative misconduct by Hortica, which would be necessary to establish bad faith, or proximate cause and damages, which would be necessary to establish negligence.  As for its other alleged misconduct, the evidence simply does not substantiate PNC's claims.  The district court did not err when it granted Hortica's post-verdict motion for JAML on PNC's bad faith and negligence counter-claims.[12]

IV.  Breach of Contract, Breach of Fiduciary Duty, and Punitive Damages Claims

PNC claims the district court erred when it granted pre-verdict JAML with respect to its claims for (1) breach of contract; (2) breach of fiduciary duty; (3) punitive damages.  Again, our review is de novo.  Phillips v. Union Pac. R.R. Co., 216 F.3d 703, 705-06 (8th Cir. 2000).

---

[12]To the extent PNC makes additional allegations of error in the district court's grant of JAML, we conclude PNC has failed to adequately develop these arguments in its brief, and as such, they are deemed abandoned.  See Rotskoff v. Cooley, 438 F.3d 852, 855 (8th Cir. 2006) (citing Fed. R. App. P. 28(a)(9)(A) (stating appellant's contentions must be supported by "citations to authorities and parts of the record on which appellant relies")).

A.     Breach of Contract[13]

PNC alleges Hortica breached the parties' contract by failing to provide a defense in Hunter. Not so. The district court excluded the only damages evidence PNC attempted to present, and PNC does not challenge the court's evidentiary ruling. We further observe PNC did not argue to the district court, as it appears to do here, that it can still prevail on its breach of contract claim and recover nominal damages. Its new argument is not properly before us. See First Union Nat'l Bank ex rel. Se. Timber Leasing Statutory Trust v. Pictet Overseas Trust Corp., 351 F.3d 810, 816 (8th Cir. 2003) ("[W]e do not normally consider issues which the district court did not rule upon . . . .").

B.     Breach of Fiduciary Duty

When the terms of an insurance policy give the insurer the right "'to determine whether an offer of compromise of a claim shall be accepted or rejected, it creates a fiduciary relationship between it and the insured with the resulting duties that grow out of such a relationship.'" Parker, 341 S.W.2d at 41 (quoting Am. Fid. & Cas. Co. v. G.A. Nichols Co., 173 F.2d 830, 832 (10th Cir. 1949)). The terms of the CGL and EPL policies contain such a "right to settle" clause. Appellant/Cross-Appellee's App. 10:2583 (CGL policy); id. 11:2704 (EPL policy). Although at least one court has questioned whether a fiduciary duty exists in cases where the insurance company assumes a monetary risk and the resulting competing interests between the policyholder and its own bottom line, see Emp'rs Ins. of Wausau v. Didion Mid-South Corp., 987 S.W.2d 745, 748 (Ark. Ct. App. 1999), the holding in Parker remains good law. It therefore appears Hortica owed PNC a duty to act as a fiduciary.

---

[13]PNC appeals only the district court's grant of pre-verdict JAML in Hunter. Its remaining claims were tried to a jury, which returned a verdict in favor of Hortica. See Jury Interrogs., R. Doc. 245. PNC does not appeal the jury verdict on this claim.

-17-

In Arkansas,

> regardless of the express terms of an agreement, a fiduciary may be held liable for conduct that does not meet the requisite standards of fair dealing, good faith, honesty, and loyalty. The guiding principle of the fiduciary relationship is that self-dealing, absent the consent of the other party to the relationship, is strictly proscribed.

Sexton Law Firm, P.A. v. Milligan, 948 S.W.2d 388, 395 (Ark. 1997) (citations omitted). PNC pleads no specific facts as to breach. Instead, it points only to "[t]he evidence discussed above regarding bad faith, particularly with respect to conflicts of interest." Appellant/Cross-Appellee's Br. 47. But as aforesaid, the evidence does not reveal the conflict PNC alleges, and as such, PNC's fiduciary duty argument meets the same fate without any further inquiry. Although Hortica owed PNC a fiduciary duty, PNC cannot demonstrate Hortica engaged in the self-dealing necessary to sustain a claim for breach.

### C.    Punitive Damages

Punitive damages are appropriate to deter bad faith by insurance companies. See Williams, 665 S.W.2d at 874. Here, though, Hortica did not exercise bad faith, so punitive damages are not appropriate.

### V.  Evidentiary Matters

PNC argues the district court excluded evidence which showed Hortica falsely represented it would continue to defend Muniz, but provided no defense until the coverage question was resolved via the declaratory judgment action. Had Hortica outright refused to provide a defense, PNC would have sought a so-called "Miller-

Shugart settlement"[14] in Muniz, allowing the plaintiffs to seek collection from Hortica and allowing PNC to resume its normal business operations. Instead, Hortica's allegedly false promises kept PNC locked in "insurance limbo" for more than a year. PNC contends the excluded evidence, in the form of continued correspondence between Hortica and PNC, demonstrates Hortica's protracted but insincere assurances. See Thomas v. Farm Bureau Ins. Co. of Ark., 698 S.W.2d 508, 509-10 (Ark. 1985) (holding evidence relevant to insurance company's mental state was erroneously excluded). It further claims the additional support for the jury's verdict provided by this excluded evidence requires this court to reverse and remand for a new trial.

Reversal on an evidentiary ruling is appropriate where the ruling amounted to a clear and prejudicial abuse of discretion affecting a substantial right or having more than a slight influence on the verdict. Weems v. Tyson Foods, Inc., 665 F.3d 958, 964 (8th Cir. 2011) (quotations and citations omitted).

> An abuse of discretion occurs 'when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment.'

E.E.O.C. v. Prod. Fabricators, Inc., 666 F.3d 1170, 1172 (8th Cir. 2012) (quoting Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984)).

Before trial, PNC filed a motion to compel Hortica to pay attorneys' fees. Hortica had refused payment, insisting the fees PNC's counsel charged were

---

[14]A Miller-Shugart settlement allows an insured to consent to a judgment in favor of the plaintiff on the condition the plaintiff will satisfy the judgment only out of the proceeds from the insurance policy and will not seek recovery against the insured personally. See Miller v. Shugart, 316 N.W.2d 729 (Minn. 1982).

unreasonably high. A magistrate judge granted PNC's motion in part and set reasonable compensation rates for partners and associates working on PNC's behalf. On appeal by Hortica, the district court reduced the compensation award, holding Hortica was not required to pay for cross-claims PNC brought in <u>Muniz</u>. Much of the evidence PNC sought to admit rehashed this compensation dispute. Although the district court did not state its reason for excluding PNC's proffered evidence, it appeared to do so because the evidence disclosed a legitimate fee dispute rather than dawdling undertaken in bad faith. The district court, in other words, was not inclined to allow PNC to introduce evidence to reframe a reasonable and already-resolved fee dispute as a ruse perpetrated by Hortica to prevent PNC from settling with the <u>Muniz</u> plaintiffs. After reviewing the excluded evidence, we cannot say the district court abused its considerable discretion in reaching this assessment.

Moreover, we fail to see how this "insurance limbo" harmed PNC. For one thing, PNC presents no evidence suggesting the <u>Muniz</u> plaintiffs were willing to consider a "<u>Miller-Shugart</u>" settlement. Further, any delay in payments worked to the detriment of Locke Lord, not PNC. By all accounts, Locke Lord continued to represent PNC vigorously despite Hortica's alleged recalcitrance. And the district court has already settled the bill for fees in the <u>Muniz</u> defense; any compensation PNC seeks above this figure contravenes the district court's order, which PNC does not directly challenge. In sum, we see nothing in the excluded evidence which would have more than a slight influence on the outcome in the district court.[15]

_____

[15]We also reject PNC's frivolous argument the district court excluded evidence of Hortica's supposed attempt to effect an accord and satisfaction via the checks for attorneys' fees it tendered. <u>See</u> <u>Glover v. Woodhaven Homes, Inc.</u>, 57 S.W.3d 211, 216 (Ark. 2001) (citations omitted) (defining accord and satisfaction); Ark. Admin. Code § 054.00.43-9(l) ("No insurer shall issue checks or drafts in partial settlement of a loss or claim under a specific coverage which contains language which releases the insurer or its insured from total liability."). PNC's attempt to twist the language on Hortica's payment statements is not persuasive. Even assuming Hortica did attempt an accord and satisfaction, PNC fails to demonstrate, as it must, "a causal

## VI. Conclusion

We reverse the district court's denial of PNC's motion for attorneys' fees and affirm on all other issues.[16]

_____

connection between the injury received and the violation of the statutory prohibition or mandate." Carter v. Montgomery, 296 S.W.2d 442, 445 (Ark. 1956).

[16]Because we affirm the district court's judgment on the bad faith and negligence claims, we do not address Hortica's conditional cross-appeal. See Fed. R. Civ. P. 50(c)(2).