# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1619

_____

St. Jude Medical S.C., Inc., a Minnesota corporation

*Plaintiff - Appellee*

v.

Thomas M. Tormey, Jr.

*Defendant - Appellant*

Tormedco, Inc., a New York corporation

*Counter plaintiff - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 8, 2014
Filed: March 11, 2015

_____

Before RILEY, Chief Judge, WOLLMAN and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

St. Jude Medical Center, Inc. ("St. Jude"), sued Thomas M. Tormey, Jr., its former employee, to recover $650,000 plus statutory interest owed on a promissory

note. Tormey disputed his liability on the note and filed counterclaims arguing St. Jude breached Tormey's employment contract. Tormey also added his company, Tormedco, Inc., as a plaintiff to the counterclaims and asserted an additional claim on behalf of Tormedco against St. Jude. The district court[1] granted judgment as a matter of law to St. Jude on its collection claim, on the counterclaims, and on Tormedco's claim after a jury was unable to reach a verdict. Tormey and Tormedco appeal, and we affirm.

I

In 2001, St. Jude hired Tormey to work as an independent sales representative, selling its cardiac-related medical devices such as pacemakers and defibrillators. Tormey previously worked for Medtronic in this same capacity for fifteen years. To initiate his employment with St. Jude, Tormey entered into several agreements including a representative agreement, a separate letter agreement, an asset purchase agreement, and a loan agreement.

The representative agreement provided the length of Tormey's contract with St. Jude, his salary, his sales territory, his commission rate, and a procedure for setting his sales quotas. It also detailed that for the first year of Tormey's contract, his sales quota would be set at zero due to a noncompete agreement he held with Medtronic. The representative agreement further provided that St. Jude would hire a "technical support specialist (TSS) as soon as practicable" to assist Tormey with his work and that St. Jude could terminate Tormey if he failed to meet sales quotas in three out of any twelve consecutive months.

---

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

In the separate letter agreement and asset purchase agreement, Tormey agreed to form a corporation through which he would conduct his business for St. Jude. Then, on October 3, 2006, the corporation would have the option to sell itself to St. Jude at a price derived from a formula contained in the agreements. The option, however, was contingent on the representative agreement being in full force at that time. Pursuant to these agreements, Tormey thereafter created Tormedco, Inc., in January 2002 and assigned the representative agreement he had with St. Jude to it.

St. Jude and Tormey also entered into a loan agreement, which was referenced by the separate letter agreement. The loan agreement entailed St. Jude making a $650,000 interest-free loan to Tormey. In exchange for the loan, Tormey executed a promissory note which required him to repay the loan on October 3, 2008, or upon the sale of Tormedco to St. Jude, whichever occurred earlier. The separate letter agreement indicated St. Jude would deduct the amount Tormey owed on the loan from the amount it paid for Tormedco when Tormedco exercised its option to sell itself to St. Jude.

As a result of his noncompete agreement with Medtronic, Tormey did not begin selling St. Jude's products until fall 2002. Around that same time, Tormey's wife was diagnosed with terminal lung cancer, and Tormey informed St. Jude of his wife's condition.

Also in late 2002 and into early 2003, Tormey began inquiring about when St. Jude would hire a TSS to assist him. In February 2003, Jim Catlett, Tormey's manager, emailed Tormey about his inquiry. Catlett indicated before St. Jude incurred the expense of a TSS, Catlett wanted to know Tormey's thoughts about what that person would do on a day-to-day basis. Catlett stated he had several clinical support people in training. Tormey alleged the lack of TSS support would keep him from meeting his sales quotas.

Tormey then met with St. Jude in September 2003 to discuss setting upcoming sales quotas. On September 17, Tormey sent an email to Catlett recommending minimum sales quotas. Tormey's proposed sales quotas considered several things including no TSS support, and he suggested the sales quotas be set at a minimum until the issue could be resolved. Tormey also indicated that when St. Jude hired a TSS for Tormey, the numbers would be a moot point. Until then, Tormey explained he would accomplish what was required by himself. St. Jude and Tormey signed sales quota sheets with Tormey's recommended numbers in mid-October 2003. Tormey added a handwritten note to the sheet indicating the "guarantee is based on Tormey accounts until . . . a TSS is provided according to contract."

Thereafter, on October 24, 2003, Catlett sent Tormey an email indicating St. Jude had assigned a TSS to assist Tormey. The email further indicated that if Tormey needed additional assistance, four other employees were available to support him. Tormey, however, objected to this particular TSS because he was not fully dedicated to helping Tormey. St. Jude's general counsel responded to Tormey and explained the TSS would only support others if Tormey did not need his assistance.

Tormey's wife's condition worsened in November 2003, and Tormey thereafter did not meet his sales quotas. Tormey attributes his performance in part to his wife's condition. According to Tormey, St. Jude repeatedly told him that his wife's health should be his first priority throughout her illness. Thereafter, in February and April 2004, Tormey sent emails to his managers at St. Jude proposing changes to his relationship with St. Jude. Two options included St. Jude considering the $650,000 loan paid in full.

Tormey's wife passed away on May 3, 2004. Two weeks later, Jim Gantz, a vice president at St. Jude, sent Tormey a letter terminating the representative agreement. The letter indicated Tormey's sales were unacceptable and had fallen significantly short of the sales quotas. It further included a comparison of the sales

quotas and actual sales from March 2003 through April 2004, supporting Gantz's conclusion for both pacemakers and defibrillators. After receiving the letter, Tormey spoke with Gantz on the telephone and sent a follow-up email explaining he forwarded the letter to his legal counsel as they had discussed. Gantz thereafter responded to Tormey's email and indicated he was willing to discuss any additional issues Tormey may have but directed that Tormey's counsel should be speaking with St. Jude's counsel as the matter progressed.

According to Tormey, he then had an additional telephone conversation with Gantz. During the conversation, Tormey indicated Gantz proposed that if Tormey agreed to forego any actions against St. Jude, then St. Jude would waive any claim to repayment of the $650,000. Tormey asserts he accepted Gantz's offer and presumed his obligations to St. Jude had been discharged. There are no written documents evidencing this "walk-away agreement," however, and Gantz denies it occurred. Gantz recalled speaking to Tormey only once. In the years following this alleged conversation, St. Jude sent IRS Form 1099s to Tormey for interest income, and Tormey reported the interest income on his tax returns. In preparation for Tormey's 2006 tax return, Tormey's accountant included a note indicating Tormey's loan with St. Jude was still being negotiated.

On October 30, 2008, Aimee Gordon, counsel for St. Jude, sent Tormey a letter asserting the $650,000 loan was due for repayment. Tormey did not repay the loan at that time, and he was unsure if his counsel responded to the letter. Gordon then sent a second letter on May 12, 2009, asserting the loan was due and immediately payable in full. Tormey again failed to repay the loan and made no indication of a "walk-away agreement" to Gordon.

St. Jude filed suit against Tormey in Minnesota state court on January 11, 2011, seeking to recover the amount owed on the note plus statutory interest. Tormey removed the suit to federal court. Tormey and Tormedco then asserted counterclaims

against St. Jude alleging St. Jude breached the representative agreement and fraudulently induced Tormey to leave Medtronic. Tormedco also asserted an additional claim against St. Jude for breach of contract.[2] St. Jude thereafter moved for summary judgment on its claim and the counterclaims twice, but the district court granted summary judgment in favor of St. Jude on only the counterclaims contending St. Jude engaged in fraudulent conduct. The magistrate judge[3] also denied some of Tormey's requests for discovery. The remainder of the counterclaims and St. Jude's collection claim proceeded to a jury trial.

At the close of evidence, St. Jude moved for judgment as a matter of law, arguing the evidence did not support the counterclaims or defenses asserted by Tormey or Tormedco. The district court denied St. Jude's motion, and the case was given to the jury. The jury, however, was unable to reach a unanimous decision, and the district court declared a mistrial. St. Jude then renewed its motion for judgment as a matter of law. This time, the district court granted St. Jude's motion on the counterclaims, finding they were time-barred, and on St. Jude's claim for repayment of the note, finding the evidence did not support Tormey's defense that St. Jude first committed a material breach of the representative agreement. Tormey and Tormedco appeal.

II

Tormey and Tormedco first challenge judgment as a matter of law. On appeal, we review *de novo* the district court's grant of judgment as a matter of law. Hortica-

---

[2]Because of the substantial similarity between Tormey and Tormedco's counterclaims and Tormedco's claim, the district court used the word "counterclaims" to refer to these claims collectively. For consistency, we do the same.

[3]The Honorable Tony N. Leung, United States Magistrate Judge for the District of Minnesota.

Florists' Mut. Ins. Co. v. Pittman Nursery Corp., 729 F.3d 846, 854 (8th Cir. 2013). "A court may grant judgment as a matter of law if 'the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party.'" Madden v. Lumber One Home Ctr., Inc., 745 F.3d 899, 902 (8th Cir. 2014) (quoting Fed. R. Civ. P. 50(a)(1)). In our review, we therefore consider the facts in the light most favorable to Tormey and Tormedco and give them the benefit of all reasonable inferences. Roberson v. AFC Enters., Inc., 602 F.3d 931, 933 (8th Cir. 2010).

## A. St. Jude's Collection Claim

Tormey contends the district court erred by granting judgment as a matter of law on St. Jude's claim for repayment of the $650,000 loan. Tormey argues the district court should have instead found sufficient evidence existed to support two affirmative defenses asserted by Tormey.

Tormey's first defense is that St. Jude breached a material term of the representative agreement by failing to hire a TSS for Tormey. Under Minnesota law, which applies in this case, see Chew v. American Greetings Corp., 754 F.3d 632, 635 (8th Cir. 2014), "a party who first breaches a contract is usually precluded from successfully claiming against the other party," gScribe, Inc. v. Soteria Imaging Services, LLC, No. A11-265, 2011 WL 4008303, at *5 (Minn. Ct. App. Sept. 12, 2011) (internal quotation marks and citation omitted). Accordingly, Tormey asserts, when considering all of the agreements Tormey executed with St. Jude as one unitary agreement, this first material breach by St. Jude relieved Tormey from meeting his sales quotas and ultimately his obligation to repay the loan.

Assuming St. Jude's failure to provide Tormey with TSS support until October 2003 constituted a breach of the unitary agreement, we find it did not excuse Tormey's failure to repay the note. The continued recognition of a contract as still binding after a breach is a waiver of the breach. See Wolff v. McCrossan, 210

-7-

N.W.2d 41, 43 (Minn. 1973) ("Generally, where a defendant has orally waived certain conditions of a written contract, he is estopped from asserting the nonperformance of those conditions as a defense in a suit upon the contract."); Cut Price Super Mkts. v. Kingpin Foods, Inc., 98 N.W.2d 257, 267 (Minn. 1959) ("The right to rescind [a contract] must therefore be exercised promptly on discovery of the facts from which it arises and it is clear under the law that it may be waived by continuing to treat the contract as a subsisting obligation."); see also 17A Am. Jur. 2d Contracts § 715 ("An election by a party to perform notwithstanding a breach, and thus waiving the breach, is conclusive, in the sense of depriving that party of any excuse for ceasing performance, with the result that the party at fault may require that the other party perform."). Under Minnesota law, a waiver is the "intentional relinquishment of a known right." White v. City of Elk River, 840 N.W.2d 43, 51 (Minn. 2013).

Here, although St. Jude had yet to provide Tormey with TSS support in September 2003, Tormey continued to treat his contract with St. Jude as though it remained in effect. This is evidenced by Tormey suggesting and accepting reduced sales quotas which he acknowledged he could perform himself. Consequently, Tormey bound himself to the provisions of the unitary agreement as a whole, including meeting these sales quotas and repaying the note to St. Jude, regardless of St. Jude's first breach. Accordingly, we conclude Tormey waived his ability to rely on a first-breach defense as an excuse for failing to repay the note.

Tormey's second asserted affirmative defense relies on the "walk-away agreement," arguing St. Jude and Tormey settled the debt Tormey owed. According to Tormey, the district court erred by instructing the jury to consider the existence of the "walk-away agreement" under the clear and convincing evidence standard. Instead, relying on Bolander v. Bolander, 703 N.W.2d 529, 541 (Minn. Ct. App. 2005), Tormey contends the district court should have instructed the jury to review the agreement based on the preponderance of the evidence standard because the "walk-away agreement" was not a modification to the agreements existing between

St. Jude and Tormey. Rather, like the agreement made in Petsche v. EMC Mortgage Corp., 830 F. Supp. 2d 663, 672 (D. Minn. 2011), the "walk-away agreement" was the settlement of a debt which is not considered a modification. Moreover, because the agreement was the settlement of a debt, it cannot be considered a credit agreement and need not be in writing to be enforceable. Id. Tormey concedes, however, if the "walk-away agreement" was an oral modification or a credit agreement, then it needed to be memorialized in writing to satisfy the Minnesota statute of frauds for credit agreements.

Although Tormey frames the initial issue as an objection to the district court's jury instructions, because the district court granted judgment as a matter of law, in substance, Tormey is objecting to the burden of proof applied by the district court when it reached its conclusion on Tormey's defense. To address Tormey's arguments, however, we need only consider whether the alleged "walk-away agreement" was a credit agreement within the meaning of Minnesota statute § 513.33, which maintains credit agreements must be in writing. Minn. Stat. § 513.33, subd. 2; see also Greuling v. Wells Fargo Home Mortg., Inc., 690 N.W.2d 757, 761-62 (Minn. Ct. App. 2005) ("[C]laims on agreements falling under section 513.33 fail as a matter of law if the agreement is not in writing."). A credit agreement within the meaning of § 513.33 is "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation." Minn. Stat. § 513.33, subd. 1.

First, we find Tormey's reliance on Petsche is misplaced and the case is not controlling. Instead, we find Tormey's circumstances are much like those found in Loan Store v. McConnell, No. A06-122, 2006 WL 3490807, at *3 (Minn. Ct. App. Dec. 5, 2006) ("Even if we were to interpret [§ 513.33] very narrowly, an agreement that would excuse remaining payment on the debt would fall under forbearing repayment of money."), and Carlson v. Estes, 458 N.W.2d 123, 128 (Minn. Ct. App. 1990) (finding where a lender waived a claim to some monetary value, the agreement

was a credit agreement under § 513.33 because it clearly constituted a financial accommodation and was an action to forbear the repayment of money), which determined the agreements were oral modifications to the original agreements and therefore credit agreements. Tormey's case is also distinguishable from Bolander, which discussed whether the existence of a new "promise to pay" for services rendered after expiration of the original contract was a modification to the original contract. 703 N.W.2d at 542.

Additionally, the "walk-away agreement" by itself constitutes a credit agreement regardless of whether it modified the terms of the original agreements because it was an agreement to forbear repayment. See BankCherokee v. Insignia Dev., LLC, 779 N.W.2d 896, 902 (Minn. Ct. App. 2010) ("Among the agreements subject to [the] requirements [of § 513.33] are many that commonly would serve as the basis for affirmative defenses, such as agreements to 'forbear repayment of money' or make some 'other financial accommodation.'"); Greuling, 690 N.W.2d at 762 ("The plain and unambiguous language of [§ 513.33] clearly prohibits a claim that a new credit agreement is created unless the agreement is in writing, expresses consideration, sets forth all relevant terms and conditions, and is signed by the creditor and debtor."). Consequently, because Tormey did not present evidence that the "walk-away agreement" was in writing as required by § 513.33, we find the district court did not err by granting judgment as a matter of law on this defense or on St. Jude's collection claim.

## B. Tormey's Counterclaims[4]

Tormey next contends the district court erred by granting judgment as a matter of law on his counterclaims. The district court found Tormey's counterclaims were

---

[4]Because Tormey and Tormedco appear collectively for this portion of the appeal, we refer to them simply as Tormey.

barred by the statute of limitations, and Tormey failed to present sufficient evidence to toll the period based on a theory of estoppel. On appeal, Tormey argues he reasonably relied on the "walk-away agreement" until at least May 2009 and asserted his claims in February 2011, which resulted in his claims being filed within the two-year statute of limitations provided in the representative agreement. Consequently, Tormey asserts his counterclaims were not time-barred.

Contrary to Tormey's assertion, we find the district court did not err by granting judgment as a matter of law on Tormey's counterclaims. Although Tormey does not specify the particular theory of estoppel upon which he relies, based on the claims he alleges and cases he cites, we find he is relying on promissory estoppel to toll the statute of limitations. See Bracewell v. U.S. Bank Nat'l Ass'n, 748 F.3d 793, 796 (8th Cir. 2014) (finding "[a] claim is more appropriately analyzed under the doctrine of promissory estoppel, not equitable estoppel, where representations upon which the plaintiff allegedly relied are more akin to statements of future intent than past or present fact") (alteration in original) (internal quotation marks and citation omitted). Under Minnesota law, oral promises which constitute a credit agreement within the ambit of § 513.33 cannot be enforced under a theory of promissory estoppel; the promises must be in writing. See Bracewell, 748 F.3d at 796 (affirming the dismissal of a complaint alleging promissory estoppel because the claim of an oral agreement was barred by the Minnesota Credit Agreement Statute); BankCherokee, 779 N.W.2d at 903 (affirming summary judgment because the appellant could not assert promissory estoppel as an affirmative defense on the basis of an oral promise which constituted a credit agreement under § 513.33); Christensen v. PennyMac Loan Servs., LLC, 988 F. Supp. 2d 1036, 1044 (D. Minn. 2013) (citing cases standing for the proposition that allowing parties to assert promissory estoppel as a mechanism to enforce an alleged oral promise would constitute an "end run" around the writing requirements of § 513.33). As a result, Tormey cannot assert promissory estoppel on the basis of the "walk-away agreement" to toll the statute of limitations because there

is not a writing evidencing the "walk-away agreement." We therefore find the district court properly determined Tormey's counterclaims were time-barred.

## III

Tormey finally argues the magistrate judge abused his discretion by denying the majority of Tormey's motion to compel answers to discovery requesting "sales levels for other [St. Jude] cardiac sales reps, their conversion to employee status or dismissal, and related issues." The magistrate judge granted Tormey's motion for only one territory for which Tormey sought information. As a consequence of the magistrate judge's limitation on discovery, Tormey contends he was unfairly prevented from developing a defense at trial that St. Jude terminated Tormey without cause. We, however, are without jurisdiction to decide this issue because Tormey did not object to the magistrate judge's order. See Fed. R. Civ. P. 72(a) (stating that upon issuance of a magistrate judge's order on a nondispositive issue, "[a] party may not assign as error a defect in the order not timely objected to"); McDonald v. City of St. Paul, 679 F.3d 698, 709 (8th Cir. 2012) (finding a party could not challenge a magistrate judge's nondispositive pretrial discovery order on appeal because he did not timely file objections before the district court).

## IV

For the foregoing reasons, we affirm.

_____